JOHN SWARENS v. JOHN PFNISEL ET AL.; EMMA AMEL, Appellant.—
26 S. W. (2d) 951.

Division Two, April 7, 1930.

*Frank Yeoman* and *L. A. Laughlin* for appellant.

*Charles H. Thompson* for respondent.

WHITE, J.—The judgment in this case, rendered in favor of plaintiff in the Circuit Court of Jackson County, on appeal to the Kansas City Court of Appeals was reversed and the cause was certified to this court on the ground that the ruling was in conflict with Mitchell v. Davis, 190 S. W. 357, by the Springfield Court

of Appeals. We adopt the statement of the facts and the conclusions reached by the Kansas City Court of Appeals, as follows:

"This is a suit in two counts, arising in a justice court, for the reasonable value of medical services rendered to the defendant, John Pfnisel, from February 15, 1924, to June 14, 1924. The first count prays judgment in the sum of $377 for medical services rendered by plaintiff, and the second count prays judgment in the sum of $50 for surgical services rendered to Pfnisel by Dr. J. F. Mackey on April 30, 1924, at the request of the defendants, Dr. Mackey's account being assigned to plaintiff. The justice rendered judgment against both defendants for the full amount prayed, and the defendant Mrs. Amel alone appealed to the circuit court. The case was tried in the latter court without the aid of a jury, resulting in a judgment against Mrs. Amel on both counts for the full amount prayed, and she has appealed.

"The facts show that plaintiff is a physician residing in Kansas City, Missouri, and that Dr. Mackey is a surgeon of that city; that defendant Emma Amel is a widow and cousin of John Pfnisel who boarded with her; that on February 15, 1924, Pfnisel was severely burned in a gasoline explosion occurring at the cleaning establishment where he worked; that he was taken to the City Hospital and Mrs. Amel, upon learning of the accident, called at the residence and office of plaintiff and finding plaintiff away told his wife that she desired plaintiff to accompany her to the City Hospital for the purpose of bringing Pfnisel home; that she wanted plaintiff to treat him, stating that she would pay the bill. When plaintiff returned home his wife told him of Mrs. Amel's call and request, and he went to her house. Plaintiff testified that he found 'that the insurance company' had taken or sent Pfnisel to the Research' Hospital and that he was too ill to be removed. Later, plaintiff testified that he did not know that Pfnisel 'had insurance until some time after he was in the hospital.' Plaintiff further testified that during the next week or two he made other trips to the hospital at Mrs. Amel's request and reported to her that Pfnisel's condition prevented his being taken home; that later Mrs. Amel went to plaintiff and stated that Pfnisel was likely to die and she wanted him removed to St. Mary's Hospital and there cared for by plaintiff, and stated again that she would pay plaintiff; that plaintiff and Mrs. Amel went to St. Mary's Hospital, at which place she made arrangements to have Pfnisel transferred, and for care and treatment by plaintiff, but Pfnisel refused to be moved.

"Plaintiff further testified that on March 18, 1924, Mrs. Amel went to plaintiff and stated that Pfnisel was able to be moved and that she wanted him taken to her home where she could take care of him and plaintiff could attend him, stating that she would pay plaintiff; that on that day Pfnisel was taken by plaintiff and Mrs. Amel

to the latter's home where he treated him every day for about three months; that plaintiff did not attend Pfnisel at the Hospital, but that he was treated there by an 'insurance doctor;' that it became necessary to amputate Pfnisel's thumb and finger, and Mrs. Amel authorized plaintiff to employ Dr. Mackey, a surgeon, to perform the operation and agreed to pay the sum of $50 for Dr. Mackey's services; that Mackey performed this service, and before this suit was brought Dr. Mackey assigned his account to plaintiff.

"Plaintiff further testified that Pfnisel did not employ him on February 15, 1924, because when he and Mrs. Amel went to the hospital Pfnisel was unconscious, and that Pfnisel did not at any other time say anything to plaintiff about employing him; that he did not charge Mrs. Amel on his books for these services, but made the charge solely against Pfnisel, and he explained this by saying that he was employed by several companies to treat their employees and that he always made the charge on his books against the employee treated, although he intended to charge the companies themselves for his services. The evidence shows that Pfnisel's employer carried liability insurance, and Pfnisel engaged an attorney to proceed against the employer for the damage that he had suffered. Plaintiff testified that he never rendered a bill to Mrs. Amel at any time, but about the time his attentions to Pfnisel ceased he asked her for the money and she told plaintiff 'that there was some insurance, some way or other;' that at her request he delivered his bill made out to Pfnisel to Pfnisel's attorney for payment. Pfnisel testified that he regarded the bill as too large, and offered to pay $100 in settlement thereof, which offer was refused by plaintiff. The insurance company settled with Pfnisel, but the doctor's bill was never paid either by Pfnisel or Mrs. Amel. Plaintiff testified that Mrs. Amel told him to take his bill to an attorney, who the testimony shows was Pfnisel's attorney, stating that a settlement was likely to be made 'on the insurance.' Plaintiff stated in sur-sur-rebuttal that 'I didn't know who had the insurance—who it was for.' Pfnisel testified that plaintiff never asked him to pay the bill. We take his testimony as meaning that plaintiff did not request him personally to pay it. Of course, all the testimony shows that plaintiff requested Pfnisel's attorney to pay it.

"While Mrs. Amel admitted that she showed a great interest in Pfnisel after the accident, and in fact that she did most of the things testified to by plaintiff that she did, she denied that she promised to pay plaintiff for his or Dr. Mackey's services to be rendered to Pfnisel.

"While no claim is made as to the reasonableness of the charges made by the doctors, defendant insists that the court erred in refusing to give her peremptory declaration of law at the close of all the testimony, because the alleged promise of Mrs. Amel to

pay plaintiff, not being in writing, was void under the Statute of Frauds. [Sec. 2169, R. S. 1919.] We think that this contention is well taken. In the case of Price v. Chicago, M. & St. P. Rd. Co., 40 Mo. App. 189, 194, the court said:

" 'In order to hold one for the price of goods delivered to another, in the absence of a writing, it is not only necessary to show a promise on his part, but it is requisite to show that the credit was given *solely* to the party making the promise. The relation of suretyship should not exist. And if the party receiving the goods, or for whose benefit the promise is made, be himself liable at all (except it be a joint promise) the case falls within the Statute of Frauds. In other words, the person for whose benefit the promise is made must not be credited, and must not be regarded by the plaintiff as a *debtor.*'

"See, also, 'Rottman v. Fix, 25 Mo. App. 571; Penninger v. Reilley, 44 Mo. App. 255; Osborn v. Emery, 51 Mo. App. 408; Gill v. Reed, 55 Mo. App. 246; Haeberle v. O'Day, 61 Mo. App. 391; Chick v. Frey Coal Co., 78 Mo. App. 234; Frissell v. Williams, 87 Mo. App. 518; Waggoner v. Davidson, 189 Mo. App. 345; Galamba v. Pump & Foundry Co., 191 S. W. 1084, 1086; Mueller v. Woodson, 198 S. W. 1134; 20 Cyc. 165, 166; Browne on Statute of Frauds (5 Ed.) sec. 197; 1 Reed on Statute of Frauds, sec. 85; Wood on Statute of Frauds, sec. 126. The same rule applies whether the agreement concerns goods or services. Johnson v. Bank, 60 West Va. 320; McClenahan v. Keyes, 188 Cal. 574; 27 C. J. 140-145.

"Ordinarily the question as to whom the credit was given is one for the jury, and although plaintiff's books charged Pfnisel alone for the service rendered, this might not be controlling as a matter of law, but the fact that plaintiff sued both Pfnisel and Mrs. Amel, alleging that he and Dr. Mackey rendered services at the special instance and request of both defendants and prayed judgment against both defendants and obtained judgment against them, the judgment against Pfnisel having become a final judgment, shows beyond any question that some credit was given Pfnisel. See 1 Reed on Statute of Frauds, sec. 85.] Plaintiff in view of his conduct cannot now say that credit was extended to Mrs. Amel alone. Another circumstance (but probably one for the trial court sitting as a jury) strongly showing that some credit was extended to Pfnisel, is the fact that plaintiff presented a bill made out to Pfnisel to the latter's attorney for payment. While he testified that he did this at the request of Mrs. Amel, there is no testimony that Pfnisel was indebted to Mrs. Amel and that Mrs. Amel, intending to pay the bill, referred plaintiff to Pfnisel's attorney for its payment out of money owing her by Pfnisel. The effect of plaintiff's conduct in this regard was that he acquiesced in her request that Pfnisel be looked to for payment of the bill. While

plaintiff assumed not to know a great deal about the nature of the insurance involved, there is nothing to show that Mrs. Amel carried any insurance on Pfnisel."

The construction of the clause of the Statute of Frauds providing that, "No action shall be brought to charge . . . any person upon any special promise to answer for the debt, default or mis- carriage of another person" unless the agreement is in writing, has been before the several courts of appeals in numerous cases and generally decided in accord with the ruling of the Kansas City Court of Appeals in this case. Very seldom has the question arisen in this court. The general rule may be stated thus: Where goods are sold or service rendered to one person on the oral promise of another to be answerable therefor, the contract is collateral and comes within the Statute of Frauds, the promisor is not liable if the person to whom the goods are sold or for whom the services are rendered re- mains liable; but if the promisee in such case looks alone to the promi- sor it is an original undertaking and such person is liable.

Corpus Juris states the rule thus (27 C. J. 144, sec. 30):

"An oral promise to pay for medical service rendered to another is not within the statute, if such services are rendered at the request and on the sole credit of the promisor, but it is within the statute, if they are rendered to any extent upon the credit of the person injured or ill."

Ruling Case Law has it (25 R. C. L. sec. 71, pp. 487-488):

"The question as to whether a promise is original or collateral has frequently arisen where one promises to pay for goods or other property delivered or to be delivered to another. In such case, as a general rule, the undertaking is collateral and within the statute, if the person for whose use or benefit the goods are furnished is liable. . . .

"On the other hand if the goods are delivered by the seller to one person on the promise of another to pay for them and solely on the promisor's credit the promise is original and not within the statute."

Browne on the Statute of Frauds (5 Ed.) sec. 197, puts it this way:

"As to the liability of the person for whose benefit the promise is made, it was laid down by Mr. Justice BULLER in the case of Matson v. Wharam, that if he be himself liable at all the promise of the defendant must be in writing."

In all cases where the promisor is a mere guarantor or surety the promise comes within the Statute of Frauds. It must be an original undertaking. The Kansas City Court of Appeals in Martin v. Harrington, 174 Mo. App. 707, after an exhaustive review of au-

thorities quotes from a Connecticut case the condition of a contract necessary for the application of the statute, to-wit:

" 'An undertaking by a person *not before liable,* for the *purpose* of securing or performing the same duty which the party for whom the undertaking is made *continues liable.'*

"That is to say if the original debtor is discharged—does not *continue* liable after the promisor's promise—the statute does not apply."

Some cases from this court might be cited.

In Glen v. Lehmen, 54 Mo. 45, the jury was instructed that if the defendant promised plaintiff to be responsible for the price of the steer and the steer was afterwards delivered to Clarkson on the faith of the defendant's promise, and without such promise plaintiff would not have let Clarkson have the steer, then the jury would find for the plaintiff. The court held the instruction erroneous, because the jury could find as that instruction directed and still find that the defendant was only a surety.

In Bissig v. Britton, 59 Mo. 204, Judge WAGNER wrote the opinion and stated the matter thus—refers to Browne on Frauds and then states the rule—l. c. 211:

"And the court expressly declare that it is not sufficient that the promise arise out of some new and original consideration of benefit or honor moving between the newly contracting parties, but that this new original consideration spoken of must be such as to shift the actual indebtedness to the new promisor, so that he must be bound to pay the debt as his own, the original debtor standing *to him* in the relation of surety."

It is sometimes said that in an original undertaking of this kind which would make the promisor liable and the party for whom the service is rendered is surety, but surety as to the original *promisor* and not as to the *promisee.*

The respondent refers to some cases which he claims hold that the party for whom the service is rendered may be liable and yet the promisor also held on his promise. Among the cases cited is Hill Brothers v. Bank of Seneca, 100 Mo. App. 230, opinion by Judge GOODE. In that case the party sought to be held, the bank, agreed to pay for threshing of wheat upon which it held a mortgage, and therefore there was a consideration directly passing to the promisor. The court said, l. c. 240:

"The contract in this case, so far as appears, was made for the exclusive benefit of the bank and it received the benefit in the continued work of the plaintiffs. In such case it is wholly immaterial that, in consequence of the performance of the contract, the debt of someone else will be paid, and immaterial, too, whether or not the original debtor remains liable."

The original debtor in that case was the mortgagor, the owner of the wheat. Judge GOODE would not have said that it is immaterial whether or not the original debtor was liable unless the consideration had moved directly to the promisor. He stated it as an exception to the general rule that the party receiving the service is not held liable.

We think that under the facts in this case the plaintiff did not look alone to Mrs. Amel for his pay; that he considered the defendant Pfnisel liable; he sued him and obtained judgment against him. Mrs. Amel was therefore merely surety or guarantor and her promise came within the Statute of Frauds.

The judgment of the circuit court is reversed. All concur.