RYAN EQUIPMENT COMPANY, a Missouri corporation, Plaintiff-Respondent,

v.

Walter FICKEN, Defendant-Appellant.

No. 32699.

St. Louis Court of Appeals.

Missouri.

Nov. 21, 1967.

Rehearing Denied Dec. 26, 1967.

Thurman, Nixon, Smith & Howald, Louis Jerry Weber, Hillsboro, for defendant-appellant.

Muehlenkamp, Brazil & Murray, Dellwood, for plaintiff-respondent.

TOWNSEND, Commissioner.

In this court-tried case plaintiff brought its action against defendant on an open account and defendant counter-claimed for breach of contract. Plaintiff asked for judgment on the account in the principal sum of $4817.53. Judgment for that amount plus interest was rendered in plaintiff's favor.

This Court's consideration of an appeal in such a court-tried case is governed by Section 510.310, RSMo 1949, V.A.M.S. (Supreme Court Rule 73.01(d), V.A.M.R.: " * * * The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * * "

The open account covers in general charges for equipment, parts, repairs and services with the usual credits for payments made and other allowances. There is no substantial evidence challenging the accuracy of the account other than for interest items on allegedly past due balances. Consequently controversy focuses almost entirely upon the counter-claim. The trial court made no findings of fact and entered no conclusions of law.

In support of his counter-claim defendant testified that one Walters entered into a contract with Leonard and Company to excavate and grade a certain tract of land at Fenton, Missouri, with compensation therefor at fifteen cents per yard of dirt moved and that Walters orally sub-contracted the job to defendant Ficken. Under the sub-contract defendant agreed to do the work at his own expense and Walters agreed to pay him at the rate of $14.00 per hour for each of the "160 Motor Scrapers" used by defendant. Defendant commenced

a

his work on November 18, 1959. On November 25, 1959, Mr. Hartman, vice-president of plaintiff, advised defendant that plaintiff desired to collect from Leonard and Company the payments that would become due to Walters under his contract with Leonard and Company and that plaintiff "would see that I [defendant] got paid. Would it make any difference to me if I got paid from them [plaintiff] * * *. I told him that I would agree to let them collect it if they would pay me." "Q. And did Hartman agree to do this?" A. "Yes." In implementation of the latter understanding one of plaintiff's employees brought to defendant a document reading:

"I fully agree to the above method of payment, realizing that my payment for work will have to come from the above proceeds, and that I hereby agree I will not file any lien on ground worked due to non-payment to me or demand any payment from Fay Leonard & Company, Inc.",

which defendant signed.

The latter instrument is the second page of an exhibit which plaintiff introduced upon the taking of depositions; the first page is a letter addressed to Leonard and Company, signed by Walters, stating: "I hereby authorize and request you in connection with all payments due me on this contract to prepare checks payable as follows: 'David Walters D/B/A David Walters Excavating and Ryan Equipment Company'. I hereby also authorize and request you to mail all checks direct to the Ryan Equipment Company, 3350 Morganford Road, St. Louis 16, Missouri. * * * Please sign at the bottom accepting my requests as listed above and return accepted copy direct to the Ryan Equipment Company." At the trial the whole of the two-page exhibit was admitted as a defendant's exhibit. Defendant testified that when he signed the second page he did not see the first page. The second page bears the

signed notation: "Accepted: Fay Leonard & Company, Inc. 11–28–59."

Resuming the review of defendant's testimony: Defendant stated that he knew that in signing the document last mentioned he was waiving any right to a mechanics' lien. "Q. And upon what was the consideration for you waiving that? A. The reason I did I knew I was doing a lot of business with Ryan, I was buying parts from him, and I trusted that we'd get along good as anyone. Q. And was that one of the things that you discussed with Hartman? A. Yes. Q. Is this waiver? A. Yes. Q. Would you, Mr. Ficken, have signed this agreement that you signed if you had not had Mr. Hartman's promise that you would be paid? A. No, I wouldn't of signed it if they wouldn't of agreed to pay me."

Plaintiff has nowhere raised any question of Hartman's agency.

Under date of December 19, 1959, defendant rendered to plaintiff an itemized statement showing an indebtedness of Walters to defendant on the Fenton job of $2683; the statement showed the number of hours worked by defendant's machines to and including December 16 at the rate of $14 per hour, plus a charge of $30 for gravel furnished by defendant. The statement was delivered by defendant in person to Mr. Hartman at the Ryan office— "He wanted to know in December. * * * He asked me for it. * * * He wanted to know how we stood and I made it up to the 16th."

Defendant then testified to further events in the month of December:

"Q. * * * What occurred after you delivered this bill there?

A. Well, a little later, right at the end of the month, he asked me to bring my account up to date.

Q. Who did?

A. Mr. Hartman.

Q. And how did he go about asking—

A. Well, he asked me if I would give him a check for $3500.

Q. Did he explain what that check was for?

A. He said that it would bring my account to date.

Q. Was there any understanding between you and Hartman as to what would happen to that check?

A. Yes. I didn't want to give him the check. I said I'm working there and we're going to have that much worked out in a short time. And he said well, I need the check now to balance the account out for the first of the year. He said I will, I'll hold that check. I won't cash it. I just need it here to balance out the account. I won't cash it. I'll hold it. So I said as long as he wasn't going to cash it it was all right. I'll give him the check, and I mailed him the check.

Q. Now, who suggested the amount of the check?

A. He did.

Q. Up until that time in December did you know how much they had received from the Baudendistel—Fay Leonard—

A. No, I didn't think they received anything."

The check so issued was dated December 29, 1959, but was not presented for payment until after August 22, 1962, by which time defendant had stopped payment on same.

Defendant completed his work on the job in May 1960. He received no pay for work done until June 4, 1960. On the latter date the plaintiff issued its check for $2683 payable to "David Walters d/b/a David Walters Exc. Co. and Walter Ficken and Ryan Equipment Co." As to his relationship to that check defendant testified: " * * * I barely saw the check. They asked me to endorse it and they'd apply it to my account. Q. Where did this occur? A. In Ryan's office. Q. Who was present? A. Mr. Hartman. I don't know. I guess it was other office help. Q. Was Walters present at the time? A. No. Q. And all you did was endorse the check? A. I just endorsed it. I never handled it at all. Q. Was there any stub on the check? A. I didn't think there was. I didn't—I never saw it. Q. At that time on June the 4th did you know how much Ryan had received in payment on this job? A. No. Q. Did anyone tell you that they'd received anything? A. No. Nobody told me how much they got paid or anything."

Defendant placed in evidence photostats of Leonard and Company checks made payable to Walters and Ryan Equipment Company in the stated amounts on the specified dates:

December 5, 1959 – $1785.00
January 9, 1960 – 2295.00
February 15, 1960 – 1020.00
April 22, 1960 – 1275.00
June 4, 1960 – 4461.75.

Defendant also entered in evidence the following letter handwritten on the stationery of the plaintiff:

"6/4/60

Fay Leonard & Company Inc.
6978 Chippewa Street
St. Louis, Mo

Attn: Mr. R. A. Baudendistel
      President

Dear Sir:
   This is to notify you that upon your final payment of $4461.75 on the following job completed by David Walters D/B/A David Walters Excavating, the Sieveking Oil Co and Walter Ficken will

be paid in full and you are hereby released from any liens on this job.

'Grade tract of land in St. Louis County, Missouri on the south side of Gravois Road at Missouri State Highway #141, North'

All papers have been returned to David Walters and he is paid in full for the above job.

Yours very truly

Ryan Equipment Company
by H. M. Hartman
Vice President"

This letter was produced by Leonard and Company in response to a subpoena and Mr. Baudendistel testified that it had been under his control since the date of the letter and was contained within the files of his company relating to the Fenton job. Upon cross-examination by plaintiff's counsel he stated that he was not familiar with Mr. Hartman's signature but added "I talked to Hartman a few times before that and I would refuse to pay it unless Hartman sent me that, cause Hartman would be the only one, I think, at your company that I would talk—I never talked to Mr. Ryan or anybody."

At some unstated time defendant delivered to plaintiff a statement of David Walters' account, which showed in itemized form the number of hours worked by defendant's machines from November 18, 1959 through May 15, 1960 (plus other items). This statement showed a balance of $7419.-25 owing to defendant. Subsequently another statement was delivered in person to Mr. Hartman showing a credit of $2683, leaving a balance due defendant of $4736.25. The latter statement was obviously rendered subsequent to June 4, 1960, for the credit entered thereon for $2683 was for "Credit given by Ryan" to defendant on that date. The balance shown due defendant after deducting that payment was $4736.25. The latter statement was introduced as a plaintiff's exhibit.

Later, after plaintiff had begun adding interest to statements of defendant's open account, defendant rendered a further undated statement of the items last specified but with interest charges added for the period from January 1, 1961 through December 31, 1962. This statement was directed to "Ryan Equipment Company for Dave Walters on Baudendistel Job at Fenton, Missouri." With the interest charges added the balance shown due defendant was $5304.57. This statement was mailed by defendant to plaintiff.

Plaintiff's only witness was its president, Mr. Thomas H. Ryan. Verifying invoices rendered to defendant, he testified that the balance owed by defendant on May 18, 1962, was $4471.74, plus an interest charge of $345.79 entered on that date. However, the debit balance of $4471.74 included an interest charge of $283.93 entered in plaintiff's books on January 12, 1961. We proceed to state the substance of Mr. Ryan's testimony: In the fall of 1959 Walters was in default on a debt to plaintiff for approximately $2500 for equipment purchased and services and repairs furnished. In addition Walters was in default on a mortgage debt to CIT for equipment purchased from plaintiff; as to this indebtedness CIT had no recourse against plaintiff. Both plaintiff and CIT were threatening to repossess Walters' equipment. In this setting plaintiff agreed not to repossess equipment on the basis of the debt owed it only if Walters would have all proceeds from the Leonard and Company contract assigned to it "to pay his account". Under the assignment plaintiff was paid $10,836.75 by Leonard and Company. Plaintiff in turn paid $3624 to CIT and $2033.44 to Sieveking Oil Company.* On June 4, 1960, plaintiff paid $2683 to defendant and, according to Mr. Ryan, retained $2495.87 for itself; upon cross-examination Mr. Ryan was asked:

"Q. * * * Now then, in June of 1960, when you paid the amount of twen-

---

* Defendant testified that he paid all his own bills for oil and fuel used at the Fenton job.

ty-six hundred and eighty-three to Ficken what were you paying that for?

A. To the best of my knowledge that was the full amount that we had *over and above our own collection* that was to be applied to Mr. Ficken's account and the check was so marked.

Q. Then I understand your testimony to be that the reason that you paid Ficken in June of 1964 [?1960] the amount of $2683.00 was a coincidence that that just happened to be the amount that remained?

A. I couldn't say how it was a coincidence or what, no."

Mr. Ryan's testimony discloses that he had little familiarity with the details of the transaction in which Walters assigned to plaintiff his rights to payment for the Fenton job and in which defendant Ficken consented to the assignment and waived any right to a lien. He was asked by the Court if there was an agreement between plaintiff, Walters *and defendant* to have Leonard pay plaintiff and "from that" plaintiff would pay CIT, certain oil companies and yourself and he answered "That is right." The document which constituted the assignment to plaintiff makes no mention of CIT or of any oil company. Moreover, as inquiry relating to the transaction developed, Mr. Ryan contradicted his last recited testimony. He was asked:

"Q. But was there any agreement between you and Ficken or you and Walters that you would pay CIT?

A. I have never discussed this matter with Mr. Ficken. It was discussed with Mr. Walters."

Mr. Ryan stated that as of January 1, 1960, he had not seen Ficken's initial bill for $2683 and added: "I had nothing to do with this set up." When asked when he had first seen that bill he answered: "I could not answer that because I personally did not get into this situation until way *after that job was over.*"

When queried about the authority under which plaintiff paid Sieveking Oil Company on behalf of Walters, Mr. Ryan at first found that authority in the assignment document which makes no mention of payments for fuel or oil. After a recess and a search of correspondence he found a letter from Leonard and Company dated January 7, 1960 enclosing a check for $2295 and stating that it was being forwarded with the understanding that plaintiff would make a satisfactory arrangement to pay Sieveking Oil Company. At a later point, adverting to the document of assignment, he referred to it as "this agreement, which I did not enter into".

In endeavoring to explain the background, Mr. Ryan testified: "I made an understanding with CIT, which is common practice—and I was under no obligation now, I mean legally—that if he would assign his amounts to us we would pay CIT so that their equity would be building up in this equipment and we would pay ourselves. And we also agreed verbally, I assume, until we got that letter, that he would pay the oil company." Further testimony by this witness:

"Q. And in this agreement to the assignment in [by] Walter Ficken you noticed that he was stating that he is to be paid from the proceeds of the job.

A. From the proceeds, that is right.
\*  \*  \*  \*  \*  \*

Q. And this was the agreement prepared by your office for Ficken to sign, isn't that correct?

A. That's what it seems to say. But our understanding was, and the only reason we were involved in this, was to collect money for CIT and collect money for Ryan Equipment Company that he owed us."

At the most the Ryan testimony shows that he had no knowledge of the circumstances surrounding the giving of Ficken's consent to the assignment and Ficken's

waiver of lien. His whole understanding of and interest in the taking of the assignment was directed to the liquidation of Walter's indebtedness to CIT and to Ryan Equipment Company and he was uninformed as to the manner in which that purpose was being implemented.

In June 1961, Mr. Ryan wrote to Mr. Ficken, calling attention to an alleged debit balance of $4483.45. Apparently some difference of opinion had developed between them regarding the performance of machines purchased from plaintiff by defendant, because Mr. Ryan notes that of the amount allegedly owing only $1995.06 was attributable to purchases for the machines in question. On July 6 Mr. Ryan made further inquiry of the defendant regarding his plans with reference to the account. Between the latter date and September 26 some adjustment of the complaints which defendant was making about the machines was attempted, for on the latter date Mr. Ryan wrote to defendant: "I have today authorized our shop to do the work as outlined in their ("our man and the Allis-Chalmers man") report and which they assure me will correct the difficulties that you are having * * *. The work that we are doing will of course be done on a no charge basis." On December 7, plaintiff again wrote to defendant, enclosing invoices for work done on two machines for $323.49 and $594.15 respectively and stating: "This is a very considerable amount of free work to put your machines into shape. * * * We have carried out our part of this bargain and now we ask that you carry out your part of the agreement by either paying your account in full or a substantial portion of it with proper arrangements made to pay the balance."

In December, 1961, Mr. Ryan suffered a heart attack and was "off work" for "four or five months". In January 1962, Mr. Hartman, writing on behalf of plaintiff, requested payment from defendant and stated that if payment were not received by January 29, plaintiff would "have no other alternative than to turn this account over to our Attornies for their legal action * * *." A letter to defendant dated March 26, 1962 from Mr. Hartman among plaintiff's exhibits reads: "After our discussion of March 14, 1962, re your account, you were going to check your records and advise us of a figure you would offer to clear up your account. We would appreciate you contacting Tom or myself re your offer so that this matter can be cleared up."

Queried about the period covered by the letters, Mr. Ryan testified that during that time defendant never stated to him that plaintiff owed defendant anything. Pertinent to this phase of the controversy is the further testimony of defendant:

"Q. Then what occurred after this $2683.00 was received? What's the next thing that happened?

A. Well, from then on I'd get calls from 'em and statements and they wanted me to pay some more on the bill. And I would tell them that I had more comin' than what the bill of mine was due.

Q. Did you give a copy of a total bill to them as is shown on Defendant's Exhibit 5 showing the total bill and the total breakdown?

A. Yes. But I give, I give one before this. This one later had interest in it.

Q. And that bill showed—the first one you gave them showed a balance of seventy-four nineteen twenty-five, the total amount?

A. That's right.

Q. Now then, you say you delivered subsequently another bill with interest added?

A. Yes. Then I gave 'em the one showing this twenty-six hundred dollars credit. And then later I received a bill with interest added to my parts bill and I added interest in my bill and sent 'em another one."

When defendant took to plaintiff his total bill (the one without interest added) he delivered it to Mr. Hartman with whom he had most of his dealings—"He always made appointments for me to come in and see him and I'd go in and we'd talk it over." At a conference in 1961 or "might of even been in '62", with Mr. Ryan present, "we discussed our problem and what I owed him, what he owed me, * * *." By defendant's calculations there was a difference of about $500 in defendant's favor at that time. "Q. And did you make a demand at that time for that amount? A. Yes. He asked me what I would settle for and I said, well, $500, and he [Ryan] got up and walked out. * * * Said he didn't want to be bothered with it. Wasn't feeling good. And he got up and went home. Q. And he left you and Hartman there? A. Me and Hartman stayed there and talked for 30 minutes, or so, after that." It was at this meeting with Mr. Ryan and Mr. Hartman that defendant learned how much money plaintiff had collected on the Fenton job. Further direct examination of defendant:

"Q. Mr. Ficken, at any time did you ever agree to pay Ryan Equipment without them paying you for your bill for this?

A. No. I always told them that I would pay them whenever they would pay me."

Merlin P. Ray, a salesman of plaintiff during 1959 and 1960, testified that it was regular procedure of plaintiff to prepare a list of delinquent accounts of which each salesman was furnished a copy and thereupon the relative salesman would attempt to collect from any customer on the delinquent list whom he regularly serviced. Finding the name of Mr. Ficken upon such a delinquent list, the witness was informed by the supervisors, including Mr. Hartman, that that account was being handled through the office and that he was instructed not to call upon Mr. Ficken for collection purposes although he continued to call upon him for sales. The Ficken name did not appear upon the delinquent list after Hartman had so informed Ray.

Mr. Hartman resigned his position with plaintiff in January 1963. He was not called as a witness. Walters has long since departed for parts unknown.

We reproduce verbatim that portion of the transcript concluding the trial:

"By Mr. Nixon [for defendant]: I would like to have five minutes on each side to cover it.

"By the Court: Well, that's a waste of time. The Court's already made up its mind.

"By Mr. Nixon: All right.

"By the Court: I don't mean to cut you short either.

"The Court finds in favor of the Plaintiff and against the Defendant on the Petition in the amount prayed for.

"As I calculate three years, six months, twenty-four days interest comes to $932.-00 interest.

"Finds against Defendant for the Plaintiff on the counterclaim."

The usual entry of judgment followed.

No opinion was filed by the judge. As a consequence we are not informed of the base upon which he founded his holding against the defendant on the counter-claim. Two possibilities immediately suggest themselves:

1. The Court rejected as incredible the whole of defendant's testimony relating to the alleged promise that plaintiff would see that defendant was paid for his work on the Fenton job.

2. The Statute of Frauds. Plaintiff did not plead the Statute specifically in its answer to the counter-claim. Neither was objection made to defendant's testimony relating to the details of the formation of the agreement with Hartman and to the circum-

stances of defendant's signing of the consent and waiver of lien. Plaintiff raises the question of the Statute of Frauds for the first time in its brief.

Considering these possibilities in order: If the Court based its holding upon defendant's lack of credibility, its conclusion cannot be accepted. The Court had the defendant before it and, arguendo, it may be assumed for present purposes that he was not an impressive witness. However there is too much in the record otherwise tending to confirm defendant's story about the agreement entered into with Hartman acting on behalf of plaintiff to justify a cavalier dismissal of his complaint.

It is to be noted first that the whole initiative in the matter of Walters' assignment and defendant's consent and waiver of lien was taken by the plaintiff. There is nothing to suggest that defendant initiated any negotiations looking to the making of any such arrangement. The entire set-up orig nated with the plaintiff and according to Mr. Ryan's testimony it was developed to serve its own purposes, namely, to procure payment of Walters' indebtedness to itself and to its financing confrere, CIT.

Next, Mr. Hartman's letter of June 4, 1960, furnishes cogent evidence that there existed some such agreement as that stated by defendant. In that letter to Fay Leonard and Company, plaintiff promised that upon the latter's final payment for the Fenton job "Walter Ficken will be paid in full". Leonard and Company had known since November 28, 1959 that Ficken looked to the proceeds of the Walters' contract for his pay and that he had waived his right to procure a mechanics' lien on the Leonard property. The final payment had been the subject of talks between Hartman and Mr. Baudendistel, president of Leonard and Company, and in his caution and prudence the latter had advised that he would refuse to make the payment unless such a letter were furnished by Hartman. Hence the promise was not a mere "off-the-cuff"

agreement to take care of Ficken. It was a deliberately made commitment designed to induce action by a third party. The letter can be properly interpreted as an acknowledgment of an obligation to pay "Walter Ficken * * * in full." The promise was in no way limited to the amount of Leonard's final payment. The reasonable inference is that the obligation so acknowledged was the one to perform plaintiff's promise to Ficken to pay him for his work.

In June 1960 plaintiff paid Ficken $2683. This was accomplished by means of a check in which Walters was also named as a payee. It could scarcely be contended that this payment was a gratuity to Ficken. The check was for the precise amount of the statement against Walters which Ficken had delivered to plaintiff in December 1959 *at the request of Hartman.* If there were no contract between plaintiff and defendant such as defendant asserts, why did plaintiff make such a payment to defendant? Plaintiff has not even contended that there was an agreement with Ficken—or with Walters—that Ficken was to be paid an amount equal to what was left over after the Walters indebtedness to plaintiff and to CIT had been paid. Much less has plaintiff contended that there was any agreement that Ficken was to be paid something left over after Walters' debt for fuel and oil had been paid. If the document of consent and waiver of lien of November 25, 1959 was not given by defendant to plaintiff in exchange for some commitment by plaintiff, then plaintiff would have owed no duty to defendant. Hence any balance in its hands was assets of Walters; in the absence of the asserted contract plaintiff's payment to defendant would have been a gratuitous gesture—a voluntary payment of a debt owed by a third person without any obligation of the payor to make such payment. If there were no contractual obligation of plaintiff to pay the defendant, why wasn't payment of the $2683 made to Walters? It must be concluded that the $2683 payment was

made in part performance of the contract asserted by defendant.

Ficken's consent and waiver are established facts. Of the greatest significance is the fact that plaintiff has attempted no explanation of defendant's conduct in executing the document embodying that consent and waiver. We are then presented with the anomalous situation of a person experienced in the business of excavating, grading and construction and knowledgeable in the area of mechanics' lien surrendering an important legal position and agreeing to a manipulation of his obligor's assets without any showing of his motivation therefor except such as appears in his own story of the circumstances. If defendant's explanation is to be ignored then all that is left is the presence of a freely conferred gratuity, leaving the donor without legal remedy except perhaps for the personal liability of his obligor who has alienated his principal asset. One cannot ascribe such a donative intent to the defendant.

On the initial question of whether or not a contract was formed in the terms alleged by defendant, the deposit of the $3500 check by defendant with plaintiff has little if any evidentiary value. Testimony seems to well establish that the deposit of the check was made solely for the purpose of evidencing that some substantial balance of account was then owed to plaintiff. The amount was arbitrarily fixed by plaintiff and there is no evidence that such amount then approximated the real balance. The check was delivered at a time when defendant had furnished only one month's performance of his contract with Walters and had been paid nothing. In any event it was furnished solely upon Hartman's representation that he then needed it to balance his books and that it would not be cashed.

We attach no significance to the fact that defendant Ficken endeavored to use the services of a collecting agency in trying to locate Walters and to collect from him. Lacking payment by plaintiff, after lengthy delays, it would seem to be quite the natural thing to try to collect from any other person who might also be liable for the compensation owing to defendant. Defendant has not contended that a novation was effected by virtue of the contract made by plaintiff with Ficken.

■ We find that defendant has sustained the burden of proving the contract with plaintiff alleged in his counter-claim and that the condition upon plaintiff's duty to perform its promise therein has been satisfiled by defendant's full performance of his contract with Walters.

### Statute of Frauds

When Hartman advised, defendant that plaintiff desired to collect from Leonard and Company the payments that would become due Walters, he asked if it would make any difference to defendant that he got paid by plaintiff. Defendant expressed his assent "to let them collect it if they would pay me", to which Hartman agreed. Thereafter the document of consent and waiver of lien was presented to defendant, signed by defendant and returned to plaintiff. There is thus presented a simple situation of offer and acceptance, where upon acceptance, a typical unilateral contract eventuates. Plaintiff proposed to defendant to pay defendant—and of course "pay" here means the payment of what would become due defendant under his contract with Walters—if defendant would consent to Walters' assignment and would waive his lien. Defendant accepted plaintiff's proposal by execution and delivery of the document prepared by plaintiff. Thus we find the elements of a unilateral contract—a promise on one side (the offer) and offeree's acceptance by the performance of the acts specified in the offer.[1] At this point a contract comes into

1. Except for the injection of the lien waiver in the signed document it might

be said that a bilateral contract was formed when Hartman and defendant had

existence—a contract involving only one promise (made by the offeror) for which the promisee has furnished full consideration by doing the acts requested. Nothing more was necessary to the *formation* of contract. Defendant's performance under his contract with Walters was of course a condition upon plaintiff's duty to perform its promise.

Assuming that plaintiff has raised the question of the Statute of Frauds by appropriate procedure (but see George Gifford Company v. Willman, 187 Mo.App. 29, 173 S.W. 53; Heath v. Beck, Mo.App., 231 S.W. 657), it will find little protective cover in the provisions of the Statute.

For well over two hundred years judicial legislation with respect to the application of the Statute has been one of the accepted facts of legal life. In spite of the seemingly clear words—"to charge any person upon any special promise to answer for the debt, default or miscarriage of another person" —the reports are rife with holdings that particular promises to perform obligations initially incumbent upon another do not fall within the operation of the Statute.[2] By 1800 the judicially declared exceptions to the application of the Statute had become so numerous that the great American commentator, Chancellor Kent, treated such exceptions at length and sought to classify them. The leading treatise writers of our own times (Williston on Contracts, 3rd ed., §§ 448–486; Corbin on Contracts, §§ 346–395) bear witness to the great proliferation of cases dealing with the non-application of the Statute and to the numerous and variant bases upon which non-application is made to rest.

Elaborating upon the base upon which courts generally have founded those holdings

which declare the Statute not applicable, Corbin informs us that "The 'leading object' rule in its various forms has been subjected to more or less criticism. The best answer to this criticism is to be found in the vast number of cases in which it has been applied." What is the "leading object" rule? The Supreme Court of the United States has furnished one form of that rule by saying: " * * * whenever the main purpose or object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself, or damage to the other contracting party, his promise is not within the Statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability." Emerson v. Slater, 22 How. 28, 16 L.Ed. 360.

In 1878, pursuing the theme of the "leading object", this court in Walther v. Merrell, 6 Mo.App. 370, viewed approvingly the following rule adopted by Massachusetts courts although there was no occasion to apply it in the Walther case:

"That where the main object of the promise is a benefit accruing directly to the promisor, and which he did not before enjoy, and the promise to pay the debt of another is a mere incident, then the accidental or incidental fact that the promise includes the answering for the debt of another will not bring it within the statute; but where the main object is to obtain the release of the person or property of the debtor, or other forbearance or other benefit to him, then it is within the statute, though a new consideration moves directly to the promisor."

---

their conversation and that defendant fully performed his engagement therein when he signed and delivered the document. In any event nothing further was necessary to contract formation. If the arrangement were bilateral, defendant fully performed and thereafter the only outstanding obligation would be perform-

ance by plaintiff of the terms of his promise.

2. We dea‾ here only with that part of the Statute relating to a promise to answer for the debt, default or miscarriage of another.

In the plethora of cases which has considered the applicability or non-applicability of the Statute, one finds the constantly reiterated differentiation between "original promise" and "collateral promise". Exact definition of those terms is generally lacking and the use of one or the other announces a result rather than a reason for decision. When the promise is held to be a collateral one that means that the Statute applies; if an original promise, the promisor's contractual commitment falls without the operation of the Statute. It may not be too lacking in precision to say that if the primary concern of the promisor is to aid the third party debtor his promise will be denominated "collateral"; if the promisor enters upon his engagement primarily to secure some benefit to himself his promise is "original". In Moore v. McHaney, 191 Mo.App. 686, 178 S.W. 258, 261, this Court gave substance to the concepts of "original" and "collateral":

"Where the agreement is essentially an original undertaking on the part of the promisor to pay a debt which he makes his own, as distinguished from a collateral promise to answer for the debt of another, the contract is not invalidated by the statute. * * * And, though there is some conflict and confusion in the cases treating of the precise question, there is ample authority in support of the doctrine that a direct and unqualified promise to pay the debt of another, *though the primary debt still subsists* [our emphasis], is to be regarded as original in character and unaffected by the statute, when the promise is founded upon a new and independent consideration moving to the promisor and bene-

ficial to him, and which is the motive therefor. * * * where the promise is in terms an absolute promise to pay the debt, and the new consideration is one of benefit to the promisor, which is the motive for the making thereof, it seems that the case may properly be held to be taken out of the operation of the statute.[3] In such event the undertaking is independent in character, and founded upon the special benefits accruing thereby to the promisor. This is the doctrine of Nelson v. Boynton, 3 Metc. (Mass.) 396, loc. cit. 402, 37 Am.Dec. 148, where the rule derived from the earlier cases was stated by Chief Justice Shaw. It was adopted by this court in the early case of Walther v. Merrell, 6 Mo.App. 370, in an opinion by Bakewell, J."

The application of the principles stated in Moore v. McHaney, supra, may upon occasion encounter considerable difficulty in the weighing of evidence as to the promisor's motive and purpose. There is no such difficulty in the present case. Plaintiff's own evidence makes it perfectly clear that, in making the arrangement with defendant Ficken, its prime purpose was to procure payment of Walters' indebtedness to itself and to its associated creditor CIT. If it had any concern for the welfare of Walters that concern was secondary. Its promise to Ficken was made for the purpose of procuring further security for debts owed to itself and to CIT and for the purpose of facilitating the liquidation of such debts.

We do not find apposite plaintiff's cited cases, Frostwood Drugs, Inc. v. Fisher & Frichtel Construction Company, Mo., 352 S.W.2d 694 and Kliethermes Motor Co. v. Cole Motor Service, Inc., Mo.App., 119

---

3. Restatement of the Law of Contracts, § 184, so provides by stating: "Where the consideration for a promise that all or part of a preexisting duty of a third person to the promisee shall be satisfied is in fact or apparently desired by the promisor mainly for his own pecuniary or business advantage, rather than in order to benefit the third person, the promise is not within Class II of § 178

["Contracts with an obligee to answer for him for the debt, default or miscarriage of his obligor"], unless the consideration is merely a premium for the promisor's insurance that the duty shall be discharged." For a recognized and significant example of original promise, see Burk v. Walton, 337 Mo. 781, 86 S.W.2d 92, 95 (decided on other grounds).

S.W.2d 84. Obviously the Court of Appeals in the latter case did not have before it the issue which we have last discussed.

■ We find that plaintiff's promise to Ficken did not fall within the operation of the Statute of Frauds.

Finding that defendant has established the contract as alleged in his counter-claim, we proceed to a computation of the respective accounts. Upon an inspection of the statements rendered by defendant (Defendant's Exhibit 5; Plaintiff's Exhibit F), it will be found that included therein are certain items which, under the evidence before us, cannot be attributed definitely to the earth moving and grading job at Fenton which defendant contracted to perform. Those items are:

| | |
|---|---|
| Pick up and return Sheepfoot Roller | $30.00 |
| Pick up Roadpipe with float | 10.00 |
| Pick up and return Scoop to Valley Park | 25.00 |
| Use float to move Dave's Tractor | 10.00 |
| Gravel | 174.25 |

for a total of $249.25. When this amount is deducted from the total charges which can be definitely ascribed to the Fenton job, a balance of $7170.00 is shown. Deducting from the latter figure the $2683 which was paid to defendant, a balance of $4487.00 remains unpaid.[4]

There is no evidence in the record relating to the time when payments from plaintiff to defendant were to be made under the contract asserted in the counterclaim. Neither is there any evidence as to the times when Leonard and Company were to make payments to Walters under their underlying contract. However there is testimony that the engineers for Leonard and Company made periodic surveys of the work done on the job, that is, they took what are referred to as "cross-sections" for the purpose of ascertaining what yardage had been moved since the last previous survey. Defendant testified that he "expected" to get paid when cross-sections were taken and the yardage established; then "we expected to make a draw". Accordingly, the precise times when plaintiff should have paid defendant are left indefinite. In such a situation the obligor's duty of immediate performance arises at reasonable times. See Restatement of Contracts, § 32, Comment c, illustrations 4 and 5. Under the circumstances found in this case, we deem the balance of defendant's account for work performed to be due not later than the time when final payment was made by Leonard and Company to plaintiff and Walters. Defendant had completed his work twenty days before the date of that final payment.

## INTEREST CHARGES

Plaintiff's permanent records (Exhibit A) show a balance of $4199.52 owing by defendant on December 20, 1960. To this record plaintiff added an interest charge of $283.93 on January 12, 1961. A further interest charge of $345.79 was entered in the record as of May 15, 1962.[5] If the interest charges be ignored it is plain that the balance owed by defendant was $4199.52 minus a minor payment of $11.71 on account, or a net of $4187.81. We are of opinion that the interest charge of

---

**4.** Since defendant's entire performance was given under a contract calling for a definite rate of $14 per hour, we fail to see the relevance of plaintiff's contention that defendant did not show the reasonable value of the work performed. However there was testimony that defendant's normal charge for a machine of the type used would be $15 to $16 per hour. A part of plaintiff's Exhibit A shows that when defendant rented the machines from plaintiff prior to his purchase of same the rental charge was $15 per hour. No question has been raised as to the accuracy of defendant's statement of the number of hours which his machines actually worked.

**5.** In the interim there were no charges made to the accourt which were not shortly paid.

$345.79 must be wholly eliminated and that the charge of $283.93 must be reduced.

Plaintiff's exhibit shows that the interest charge of $345.79 was for the period January 1, 1961 to May 15, 1962, inclusive. We have found that the full amount of defendant's compensation should have been paid not later than June 4, 1960. If he had been so paid the amount thereof would have exceeded the amount owed to plaintiff on the open account, there would have been a set-off of the whole of plaintiff's account and accordingly no interest could have accrued for any subsequent period.

Plaintiff's interest charge of $283.93 was for the year 1960. Plaintiff's permanent record (Exhibit A) shows that according to its own computation the balances owed by defendant at the end of each month were as follows:

End of January 1960.......$5376.61
February 1960........ 5555.20
March 1960........ 5828.65
April 1960........ 5828.65
May 1960........ 6110.33.

As defendant's full compensation should have been paid by June 4, 1960, we compute interest on the above amounts at the rate of six per cent per annum for the months above specified plus four days and find that such interest amounts to $147.56. This method of computation is that which is most favorable to plaintiff. Perhaps defendant should have been paid some portion of his total compensation at some time or times prior to June 4, 1960, but in view of the absence of a contract term specifying the times of payment we must content ourselves by finding that the whole of such compensation should have been paid not later than June 4, 1960. When the above-named interest is added to the debit balance of $4187.81, we find that the defendant owed an overall total of $4335.37, an amount more than offset by the balance of $4487 owed by plaintiff to defendant as of June 4, 1960.

We find that on July 6, 1966, the date of the circuit court judgment, the sum of $151.63 owing to defendant had been past due since June 4, 1960. Interest thereon at the rate of six per cent per annum totals $54.59. We find that defendant should have had judgment against plaintiff for $206.22 on July 6, 1966.

The judgment is reversed and the cause is remanded to the Circuit Court of Jefferson County with directions to enter judgment for defendant against plaintiff for $206.22 as of July 6, 1966.

PER CURIAM.

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, the judgment is reversed and the cause is remanded to the Circuit Court of Jefferson County with directions to enter judgment for defendant against plaintiff for $206.22 as of July 6, 1966.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.