### Douglas D. OWENS, Appellant–Respondent,

v.

### Leonard GOLDAMMER and Golden Accounting Tax and Consultant Services, Inc., Respondent–Appellant.

### Nos. WD 59411, WD 59436.

Missouri Court of Appeals,
Western District.

June 11, 2002.

Daniel Roy Young, Kansas City, for Appellant.

Robert James Bjerg, Kansas City, for Respondent.

FOREST W. HANNA, Senior Judge.

Leonard Goldammer is the owner of Golden Accounting Tax and Consultant Service. Mr. Goldammer, and his accounting business, provided accounting services for Centennial Land & Development, Inc., Residential Project, which was a residential real estate development project owned by Barbara Naughton.[1] The Centennial Project consisted of over 500 acres of land located in Clinton County. Sometime before 1995, the plaintiff, Douglas Owens, became a customer of defendant, Golden Accounting and Goldammer.[2] Golden Accounting Tax, through Mr. Goldammer, provided accounting, payroll, and some tax audit services for one of Mr. Owens' businesses.

Owens sued Goldammer and his business, alleging in part that Goldammer breached his oral agreement to guarantee a $50,000 loan from Owens to Ms. Naughton. The jury returned verdicts in favor of Owens on his claim for breach of oral contract and his fraud claim, with the actual damages on the contract claim set at $43,042.84, plus $4,814.04 prejudgment interest.[3] The jury found in Goldammer's favor on Owens' negligent misrepresentation and breach of fiduciary duty claims. Both parties appealed. Both parties raise numerous points but the decisive issue on this appeal is cross-appellant Goldammer's argument that his oral promise to pay the debt of another falls within the statute of frauds.

Owens' hobby shop business had just completed a very profitable year. During discussions about Owens' tax liability, Goldammer and Owens considered various investment opportunities. Goldammer told Owens that he thought that the Centennial Project was a good investment and suggested that Owens consider investing in it. At the time, the IRS and Missouri had tax liens against the property. Owens understood that his money would help clear the liens so that the project could get under way.

On February 24, 1995, because of Goldammer's recommendation, Owens sent Ms. Naughton a check payable to her in the amount of $50,000 for the project. Goldammer orally agreed to guarantee the loan with a fifteen percent rate of interest and a fifteen percent return.[4] Naughton was unaware of Goldammer's guarantee. Subsequently, on July 13, 1995, Owens made a second loan for $160,488, secured by a deed of trust on the property.

Neither Goldammer nor his business, Golden Tax, had an ownership interest in the project, however, he and his mother had invested $121,000 in the project, secured by a deed of trust on the project's property. Goldammer had a written

---

1. Centennial Project was never incorporated.

2. For our purpose there is no distinction between the liability of Goldammer and Golden Accounting; thus, both parties will be referred to as "Goldammer."

3. The jury awarded no damages on the fraud count, and that issue has not been appealed by either party.

4. Mr. Goldammer denies that he guaranteed the loan but acknowledges that it is not an issue on appeal, a point with which we agree.

agreement with the Centennial Project, which provided that Goldammer negotiate payment of taxes and lien releases with the IRS and the Missouri Department of Revenue, assist Naughton in obtaining finances for the project, and provide consulting and administrative duties for the project. He also assisted in the coordination of the project. In exchange, Goldammer was to receive five percent of the price of each lot sold, which was described as delayed payment for services previously rendered for his work on the IRS and Missouri tax liens. The five percent fee was based on the gross sale of the lot, regardless of whether the sale was profitable or not.

The Centennial Project ultimately failed and Naughton filed bankruptcy. Owens proceeded on his claim for $50,000, plus thirty percent interest against Naughton in the bankruptcy court. Owens received partial satisfaction of his debt when the bankruptcy court distributed Naughton's assets. Subsequently, Owens filed this lawsuit against Goldammer for the difference between the loan, plus interest, minus the amount recovered from the bankruptcy court.

The second loan of $160,488 is not a part of this lawsuit. That loan was initiated by Owens on his own without any guarantees from Goldammer. It was satisfied later when Owens received the real estate investment property.

There is no written documentation of the loan at issue except the $50,000 check payable to Naughton. There is no promissory note and, of course, no written guaranty from Goldammer to Owens.

We agree with the parties that submissibility of the breach of contract claim is the issue here.[5] Submissibility is an issue of law, reviewable de novo, an issue inherent in every appeal. *Meinhold v. Huang*, 687 S.W.2d 596, 598 (Mo.App. 1985).

Goldammer maintains that the Missouri Statute of Frauds requires that any promise to pay the debt of another must be in writing. Section 432.010, RSMo. Owens argues that Goldammer's promise was an original undertaking placing it outside of the Statute of Frauds and, thus, enforceable. Because the Statute of Frauds requires such a guaranty to be in writing, our inquiry is whether the agreement was an original promise, outside of the statute, or a collateral promise, within the statute. *Carvitto v. Ryle*, 495 S.W.2d 109, 114 (Mo. App.1973).

Section 432.010, RSMo 1978, provides in pertinent part that "[n]o action shall be brought to ... charge any person upon any special promise to answer for the debt, default or miscarriage of another person ... unless the agreement upon which the action shall be brought ... shall be in writing and signed by the party to be charged therewith...." *See also, Tip–Top Plumbing Co. v. Ordemann*, 946 S.W.2d 786, 789 (Mo.App.1997). Missouri courts have recognized that "[a] claimed exception to the statute of frauds is 'regarded with the most rigid scrutiny.'" *McKenna v. McKenna*, 607 S.W.2d 464, 468 (Mo.App. 1980). The exception is to be "sparingly invoked." *Id.* (citing *Steere v. Palmer*, 359 Mo. 664, 223 S.W.2d 391 (1949)).

The original/collateral promise distinction is the standard used in deter-

---

5. One of Goldammer's points on appeal is that his motion for summary judgment should have been sustained. Owens responds that the denial of a summary judgment motion is generally unreviewable. We agree. *See Judy v. Arkansas Log Homes, Inc.*, 923 S.W.2d 409, 414 (Mo.App.1996).

mining whether an oral guarantee is enforceable. *Autoquip Corp. v. Nicholson & Assoc., Inc.*, 740 S.W.2d 664, 666 (Mo.App. 1987). An exception to the statute exists if the oral agreement to answer for the debt of another is an original promise, as opposed to a collateral promise. *Swarens v. Pfnisel*, 324 Mo. 1245, 26 S.W.2d 951, 953 (1930), *Tip–Top Plumbing Co., Inc.*, 946 S.W.2d at 789. For the oral promise to be an original obligation not covered by the statute of frauds, two elements must be met. *Diehr v. Carey*, 238 Mo.App. 889, 191 S.W.2d 296, 300 (1945). First, credit must be given by the promisee to the promisor alone. *Swarens*, 26 S.W.2d at 951–52; *Diehr*, 191 S.W.2d at 300; *Meinhold*, 687 S.W.2d at 598. In addition, the leading or main purpose of the promisor must be to gain some personal advantage for him, rather than to become the mere guarantor or surety of another's debt, and the promise must be supported by a consideration directly beneficial to the promisor. *Autoquip Corp.*, 740 S.W.2d at 667. *Swarens*, and *Diehr* hold that if the benefit went to the original obligor and the promisee looked to the original obligor for repayment, it is not an original undertaking and the promisor is merely a surety. *Swarens*, 26 S.W.2d at 954; *Diehr*, 191 S.W.2d at 299.

The facts in *Meinhold v. Huang* illustrate those situations in which a credit is given solely to the promisor. 687 S.W.2d at 597–98. Huang solicited $55,000 from Meinhold to build houses. These two individuals and a homebuilder intended to incorporate using Meinhold's money to finance the home building project. Huang promised that he would personally guarantee repayment within one year. Meinhold made the check payable to Huang. At the time of the loan there was no corporation in existence. The court noted and pointedly relied on the fact that Meinhold "did not extend credit to a non existent corporation to repay the loan ... but gave it to Huang solely in reliance upon the latter's inducements and the promise of repayment." *Id.* at 599.

In *Swarens*, the plaintiff doctor rendered medical services over a three-month period to defendant Pfnisel, who was severely burned. *Swarens*, 26 S.W.2d at 952. On a number of occasions, Mrs. Amel, who was related to Mr. Pfnisel, told Dr. Swarens she would pay Pfnisel's medical expenses. Dr. Swarens was not paid. He sued and obtained judgment against both Pfnisel and Amel. On appeal, Amel argued that her oral promise to pay was void under the Statute of Frauds. The Missouri Supreme Court agreed because the doctor "did not look alone to [promisor Amel] for his pay; that he considered the defendant Pfnisel liable; he sued him and obtained judgment against him." *Id.* at 954. Therefore, as a matter of law, Amel was a "surety or guarantor and her promise came within the statute of frauds." *Id.*

To the same effect, in *Diehr v. Carey*, judgment was entered in favor of the plaintiff doctor for medical services rendered to defendant Carey's son. 191 S.W.2d at 297. The doctor was employed to care for the boy. The claims attorney for the Carey's insurance company told the doctor that when the case was settled the insurance company would take care of the bills. *Id.* at 298. The doctor sent his bill to the father. He received payment in an amount less than his bill for services and sued the father and the insurance company for the difference. The doctor argued that because the claims attorney was acting in the interests of the insurance company, and acting on its behalf, he made an agreement which was an original contract. *Id.* at 299. The court noted that, notwithstanding the claims attorney's oral promise to pay the doctor's bill, the doctor looked initially to the father for payment by send-

ing him the bill for services and suing him. Therefore, the court held he did not give credit solely to the insurance company. The insurance company was held to be merely a guarantor or surety upon its oral promise to pay the medical costs. *See id.*

In our case, Owens filed his proof of claim in Naughton's bankruptcy proceeding. His claim described the agreement with Naughton as her promise to pay him the principal amount and stated that he was "entitled to a thirty percent rate of return." His proof of claim was for $64,585.50, which included a return on the principal of thirty percent. His documentation was his cancelled check payable to Barbara Naughton for $50,000. The promisee's action in seeking repayment of the debt from Naughton identifies her, as a matter of law, as the original obligor primarily liable on the debt. See, *Swarens*, 26 S.W.2d at 953; *Diehr*, 191 S.W.2d at 299.

When Owens put his money into the Centennial Project, his check was payable and delivered to Naughton, not Goldammer. The money was for the Centennial Project. The project was owned and operated by Naughton, not Goldammer. There was no evidence suggesting, or argument made, that Goldammer had any control over the funds. When Owens demanded his money back, he sought recovery from Naughton, for not only the principal, but thirty percent interest. He pursued his claim under the theory that Naughton was the original debtor who owed him the money and interest.[6]

Owens' court testimony denies his legal argument on appeal. Owens testified that Goldammer guaranteed the loan and, thus,

his risk was minimal "because if Barbara Naughton didn't pay it back, Leonard said he would." This testimony is representative of his evidence.

The proof of the promisor's leading or main purpose in guarantying the debt fell short of the mark as well. For the oral promise to be an original obligation the leading or main purpose of the promisor in making the promise must be to gain some advantage for himself, rather than to become the mere guarantor or surety of another's debt, and furthermore, the promise must be supported by a consideration beneficial to the promisor. *Handy Pantry Food Stores, Inc. v. Kwik Trip Mkts., Inc.*, 692 S.W.2d 388, 390 (Mo.App.1985).

The cases which have considered the leading or main purpose rule seek to determine the primary objective of the promisor in making the promise to repay the loan. If the primary purpose is to serve his own interests, either gaining a benefit for himself or inducing a detriment to the promisee, the promise is held to be an original undertaking and enforceable. *See Ryan Equip. Co. v. Ficken*, 423 S.W.2d 63, 72 (Mo.App.1967).

To show that the leading or main purpose was for his own purposes, Owens points to Goldammer's investment in the project and the terms of the contract between Goldammer's business and the Centennial Project. Owens claims that Goldammer benefited from the loan because the money was used to pay off the preexisting tax liens, which helped get the project under way, and, thus, increased the prospects for the sale of lots for which he would receive five percent of the sale price

---

6. Owens' position that he gave credit solely to Goldammer is further diminished by the fact that in July 1995, a few months after making the original loan of $50,000, without any advice or involvement from Goldammer, Owens made a second loan to Naughton of $160,488. This transaction took place before the due date of his loan of his $50,000 in October 1995. The loan was secured by a deed of trust.

of each lot sold. Also, Owens argues that Goldammer received greater protection for his deed of trust on the property in the event of liquidation of the project.

A case where the primary purpose of the promisor was to serve the promisor's own interests is *Carvitto v. Ryle*, 495 S.W.2d 109, 114 (Mo.App.1973). Carvitto was a cement subcontractor who was providing services to the homeowner, Ryle. Carvitto had threatened to leave the homeowner's job because he believed that the general contractor, who had hired him, was unable to pay his bill. *Id.* at 111. Ryle orally promised the subcontractor that he would take care of his bill in order to keep him working on the job and to complete the concrete work on his home in a timely manner. Carvitto obtained a judgment against the Ryle based on his oral promise to pay if he continued work on his home. On appeal, the court held that the leading and main object of the homeowner's promise to the subcontractor was in the homeowner's own interest, in that he was directly and personally benefited. *Id.* at 114–15.

To the same effect, see *Tip–Top Plumbing Co. v. Ordemann*, 946 S.W.2d 786 (Mo. App.1997). G.W. Construction, Inc. and Goode Construction, Inc. had operated a partnership engaged in the construction business. Tip–Top Plumbing had provided services as a plumbing contractor to the partnership. At some point, the partnership was dissolved but still had outstanding construction projects, and. G.W. Construction continued to carry out that. business. Ordemann, the president of G.W. Construction, had personally guaranteed several bank loans covering projects that Tip–Top was working at the time of the dissolution of the original business. Ordemann would be personally liable on the loans if the projects were not completed. *Id.* at 789. Tip–Top threatened to stop working on those projects because of its concern that it would not be paid. Ordemann personally guaranteed the amounts owed to Tip–Top in exchange for Tip–Top's agreement to complete the outstanding projects and to handle the plumbing work for future contracts. As such, the court held, the main purpose of the Ordemann's promise that he would personally "take care of" Tip–Top's contracts was to gain a benefit for himself in that he had a personal interest in completing the outstanding projects, and protecting his personal exposure on outstanding bank loans. *Id.* at 789–90.

In both *Carvitto* and *Tip–Top Plumbing,* the promisor received a direct benefit from the agreement with the promisee to qualify as an exception to the Statute of Frauds. *Carvitto,* 495 S.W.2d at 114–15; *Tip–Top Plumbing* 946 S.W.2d at 790. In both cases the creditors were induced to forgo available action against the original debtors by reason of the promise of another to pay the debt. The forbearance, which rendered direct benefits to the promisors, formed the consideration for the promises and the conclusion that they were original promises rather than collateral agreements.

In *Handy Pantry Food Stores, Inc. v. Kwik Trip Markets, Inc.,* 692 S.W.2d 388, 390 (Mo.App.1985), there was no new and independent consideration flowing from the creditor to the promisor. William Yinger became indebted when he purchased a retail food store from Handy Pantry. He abandoned the venture, and, with another individual, formed Kwik Trip Markets, Inc., in which he was a corporate officer and shareholder. He made monthly payments of $500 to Handy Pantry on his debt. His last payment to Handy Pantry was drawn on Kwik Trip's account and signed by him as a corporate officer. Handy Pantry argued that Kwik Trip

promised to pay Yinger's debt for the assets of the food store on the theory that the latter corporation had assumed the debt. The mere fact that Yinger was a corporate officer and shareholder was insufficient to overcome the requirements of the statute. *Id.* The court noted that the undertaking lacked consideration even assuming, as the court did, that Yinger had the authority to bind Kwik Trip, and that Kwik Trip benefited from it. *Id.* The court held that the oral promise was unenforceable under the statute of frauds. *Id.*

Although Goldammer's prospects for receiving his delayed compensation were improved by the additional money put into the project, and his investment received some degree of protection, notwithstanding that it was secured by a deed of trust, the benefits to Goldammer were incidental and indirect. The facts relative to Goldammer's arrangements with the Centennial Project do not establish that Goldammer entered into a new or independent undertaking such as to take the oral promise out of the statute. Moreover, there is a lack of new consideration flowing from the creditor to the promisor. Instead, Naughton, the owner and the original debtor, received the direct benefit of the loan.

The judgment for breach of contract in favor of Owens against Goldammer and Golden Accounting Tax and Consultant Service is reversed and the case is remanded for entry of a judgment in accordance with this opinion.

LISA WHITE HARDWICK, Presiding Judge, and ROBERT G. ULRICH, Judge, concur.