**The STATE of Texas, Appellant,**

v.

**E. Clayton MALONE, Appellee.**

**No. 09 83 257 CV.**

Court of Appeals of Texas, Beaumont.

March 28, 1985.

As Amended May 16, 1985.

Rehearing Denied May 16, 1985.

Jerry L. Zunker, Gen. Counsel, Bill Moss, Adele Winn, Asst. Gen. Counsels, Austin, for appellant.

John T. Muegge, Austin, Richard D. Hughes, Hughes, Moore & Sikes, Nederland, for appellee.

## OPINION

BROOKSHIRE, Justice.

This appeal results from disciplinary action taken by a Grievance Committee of the State Bar. In 1980 the District Grievance Committee No. 3–B, Appellant herein, brought suit against E. Clayton Malone. The Grievance Committee's pleadings of misconduct against Malone included: (1) neglect of legal matters, (2) failure to seek the lawful objectives of several of his clients, (3) failure to cooperate with the Grievance Committee in its investigations of the complaints and (4) conduct of a prejudicial nature which hindered the administration of justice.

Trial was held before a jury. The committee proffered nine witnesses during a

five day trial. Malone testified on his own behalf. The committee requested special issues on all of the pleadings of misconduct as set out above. Generally, the district court allowed all special issues requested except those special issues on Appellee's intentional failure to seek the lawful objectives of his clients.

After an unfavorable jury verdict, the committee filed a Motion for Judgment Notwithstanding the Verdict. After a hearing on the same in September, 1983, the district court entered a take nothing judgment against the committee. Appeal was perfected timely.

The brief containing the authorities and arguments of Appellant is organized to deal with the various complaints filed with the committee by individual citizens. The committee's oral submission followed the same outline. No brief has been filed by Appellee, nor did he appear at oral submission.

## MALONE'S FAILURE TO COOPERATE

### (Points of Error 1 and 2)

The record developed at trial clearly demonstrates that Malone failed in fact to cooperate with the Grievance Committee in its investigative procedures concerning the filed complaints received from individual citizens. The committee was charged with certain duties. It made conscientious efforts to discharge these duties. The committee obviously was trying to protect the public and the public interest as well as arrive at the truth of certain complaints against Appellee. *See Galindo v. State,* 535 S.W.2d 923 (Tex.Civ.App.—Corpus Christi 1976, no writ). The committee necessarily was endeavoring to protect and enhance the sought-after, good reputation of the practicing lawyers of Texas. It was active and conscientious in its task. As an example, Jerry Whiteker, then a member, was assigned the first complaint from Kenneth Rolling. Whiteker worked on, or was assigned to, all of the complaints, either directly or indirectly. Later on, he was elected chairman of the committee. The committee, we find, was expertly and fairly

balanced. It was composed of outstanding lay members as well as members from the major segments of the Bar—some defense attorneys, some plaintiffs' attorneys, some general practitioners. A number of the committee members, including the Vice-Chairman, Clayton Dark, attended the trial. Whiteker testified that the duties of the committee were imposed upon it by law and by the State Bar Act. The duties were to hear complaints from citizens about attorneys and to inquire, in an intelligent and equitable way, into the attorney's conduct both as to acts of omission and commission.

The complaints of the citizens, in this case, initially went to William Drew Perkins, then Chairman. The chairman assigns a member of the committee to look into the complaint. After attempting to find the relevant facts, a report is made to the full committee. The committee then discusses it and takes a vote on the individual complaints. The Appellee was given notice and opportunity to be heard in regard to each of the complaints. The record demonstrates that either by letter or telephone conversation or personal contact the Appellee was asked for his explanation. He was also urged to be present to present his side of the complaint to the committee, but Appellee declined to attend the committee meetings. From the first committee meeting to the last, Appellee did not respond in writing; did not attend; never told his side of the case, if one existed; never delivered any documents; and never gave any information. In connection with one of the hearings, William Drew Perkins, the Chairman, had Appellee subpoenaed on two different complaints. The subpoena was served by the sheriff but Appellee failed to appear. Appellee on one occasion, by phone, said he would not attend because of a conflict. Perkins agreed to reset the hearing.

In the documentary exhibits we find a letter from Whiteker to Appellee dated June 1, 1981, dispatched by certified mail, with return receipt requested. It concerned a grievance of Richard Jordan, concerning his divorce proceeding. This letter

contains these sentences: "I would be happy to visit with you about this matter in person or by telephone, but I will require a written report and would appreciate having this report within ten (10) days of the date of this letter. Thank you for your prompt cooperation in this matter. I look forward to seeing you soon." The receipt for certified mail is signed "Clayton Malone". There are two letters from William Drew Perkins to Appellee, one dated July 10, 1980, and one dated May 5, 1981. The July 10, 1980, letter contains these paragraphs:

"It is vital to the legal profession that attorneys innocent of any wrongdoing are promptly cleared and that those guilty of unethical conduct are promptly disciplined. Therefore, the policy of the State Bar is that the grievance committee must investigate *all* complaints brought to its attention and, of course, our investigation of this grievance does not mean we have determined there has been any misconduct by you.

"Your cooperation, and your prompt reply to the complaint, are requested so this matter can be resolved without delay." (Emphasis theirs)

The May 5, 1981, letter makes the same appeal. Both letters were sent by certified mail, return receipt requested. There are other letters of a similar nature concerning the complaints of Brenda Munsch and Marjorie Beall. Approximately ten such letters were posted to Appellee by certified mail, but no response was forthcoming from Appellee. Appellee admitted that he was in receipt of the correspondence concerning the six grievances, but he did not provide a written reply concerning any of the numerous complaints. The Grievance Committee conducted several hearings on these complaints. Each time Appellee was given notice of the time and place and asked to appear. He never did appear.

 We sanguinely find and hold that the documentary exhibits, coupled with Appellee's own testimony, inter alia, glaringly prove the Appellee failed to cooperate with the Grievance Committee. Nevertheless, we decline to hold, as a matter of law, that

this failure is a separate, independent ground for disciplinary action. Certainly the District Court may consider this failure in determining punishment based on *TEX. REV.CIV.STAT.ANN., Title 14 App., art. 12, sec. 28* (Vernon 1973), commonly referred to as the "State Bar Rules". The trial judge, pursuant to *Sec. 28*, shall: "find the defendant guilty, he shall determine whether the party shall be (a) reprimanded, or (b) suspended from practice ... or (c) disbarred...." *See Galindo v. State, supra*. In connection with this first point of error, we find and hold that the Appellee was accorded procedural due process. As written and argued, we do not sustain Point One. Point Two is not dispositive in this appeal.

## THE MARJORIE BEALL COMPLAINT

### (Points of Error 4, 5, 6, 7 and 8)

After reviewing the record, we sustain Appellant's Points of Error Four and Six, that Appellee willfully neglected to prepare and submit a divorce decree for Marjorie Beall. As a matter of law, we sustain Points of Error Seven and Eight because Appellee failed to seek Beall's lawful objectives in obtaining a written decree of divorce. After being discharged, Appellee failed to withdraw as Beall's attorney in connection with a divorce proceeding from her husband. Point Five is not dispositive, in our opinion, under this record.

Beall testified that Appellee was hired "to take care of a divorce between my husband and I, uncontested divorce." Appellee's first interview with Beall regarding the divorce was in the early part of June, 1980. Beall testified that she and her husband had written down a settlement agreement, dividing their property, and providing that she would have custody of their son and that she would receive child support from her husband. She testified that Appellee agreed to take care of the handling of the divorce and that "if it came down to it, that he would represent me in court if we had any problems." She further testified that the matter came to the court's attention and the divorce was grant-

ed October 2 or 3, 1980, but, at that time, she did not know if a written decree had been filed. Beall contacted Appellee several times by telephone after the divorce was granted about obtaining a written decree or judgment. Appellee said he would take care of the matter of the written decree but did not do so.

Beall further testified that she had attempted to enforce the child support payments in the State of Louisiana where she now resides. She had gone to about five lawyers but was advised that a written decree of divorce was necessary before any action could commence. She has had no success in enforcing the support order and her husband, at the time of the trial, was about two and a half years behind in child support.

Plaintiff's Exhibit No. Seven was admitted into evidence without objection. The exhibit consisted of copies of all documents on file in the Beall divorce action. Exhibit No. Seven included copies of the docket sheet, the original petition for divorce, a waiver of citation, a letter from Appellant requesting a list of the documents on file from the district clerk and the district clerk's response.

Appellee unequivocally stated that he had obtained a divorce for Beall but admitted that there was no written decree of divorce on file. Appellee conceded that there was no property settlement on file and further admitted that, in most divorce cases, there is a written decree of divorce entered. Appellee claimed that, after the divorce, both parties were dissatisfied and that Marjorie "fired me on the spot". Appellee admitted that the divorce judgment was that of the court's and not of Beall's. Appellee conceded that under the proper rules of procedure the decree should have been reduced to writing, that he failed to do so and that he also failed to withdraw.

We find and hold that it was established in this record as a matter of law that Appellee willfully neglected a legal matter entrusted to him and he intentionally failed to draft, prepare and file the divorce decree in accordance with the judge's orders and

pronouncements from the bench at the divorce hearing. Hence, he thwarted Beall's lawful objectives. We reverse and render judgment for Appellant on Points of Error Four, Six, Seven and Eight. We sever the Beall complaint from the points remanded for another trial. We direct the court below to render on same.

## THE BRENDA MUNSCH COMPLAINT

### (Points of Error 9 and 10)

The record below clearly establishes that Appellee failed to seek the lawful objectives of Munsch by intentionally failing to timely file for record a deed and deed of trust. This was in connection with the purchase of real estate. He also failed to obtain a title insurance policy. In brief summary, Munsch testified that she hired Appellee to take care of *all legal and professional matters in connection with the purchase of a lot* in Polk County. She swore: "[W]e had never bought anything like this. So, we thought we would have an attorney take care of all legal matters. And I paid Mr. Malone $180 on March 3rd to just completely take the whole thing off of my hands and see that it was handled legally and that we would be protected in every aspect."

Munsch testified that upon Appellee's advice she made the down payment of $2,000.00 and continued to make installment payments on the property. She testified that she hand-delivered the deed and deed of trust to Appellee. She swore she called Appellee's office several times because she had not received the title insurance policy but the secretary "hung up" on her. Munsch testified she checked with the courthouse on June 23, 1980, and found that the legal instruments had not been filed. The next day, June 24, 1980, she went to Appellee's office and, on demand, was refunded her money.

Appellee testified that he prepared a first contract of sale, note, deed and deed of trust, charging her approximately $20.00 per instrument. He testified that he received payment for an owner's title policy

and for "whatever work I did for her." Appellee admitted that he was supposed to have filed the deed and the deed of trust for Munsch. The record shows that the owner's title policy was not issued. Appellee claimed that he had not acted to prejudice or damage Munsch, also explaining that he had moved the location of his office during that period.

We find that, in connection with the delay in the filing of the deed and deed of trust, Appellee, as a matter of law, failed to seek the proper and lawful objectives of his client, Munsch. When the down payment was paid and the installment payments were made on the land, it was imperative that her title papers should have been recorded. His office, whether moved or not, was reasonably close to the County Clerk's Office.

Appellee seemed to justify his position by saying: "She was charged only a minimum fee for the deed, note [,] deed of trust, per instrument, approximately $20...." We sanguinely hold that this would not be a defense. We reverse and render judgment for Appellant on Point of Error Nine. We sustain Nine as a matter of law. Point Ten, hence, is no longer dispositive. We sever the Munsch complaint from the points remanded for another trial. We direct the court below to render on same.

### THE KENNETH ROLLING COMPLAINT

(Points of Error 11, 12, 13, 14, 15, 16, 17, 18 and 19)

The Kenneth Rolling complaint involves Appellant's Points of Error Eleven through Nineteen. Appellant argues that the district court erred in overruling the Motion for Judgment Notwithstanding the Verdict because the evidence proves, as a matter of law, that an attorney-client relationship existed between Appellee and Rolling and that Appellee wilfully neglected his client's appeal of a murder conviction.

The record lucidly proves that the Appellee represented Rolling in the murder charge and a burglary charge arising in Trinity County. Appellee was paid at least $200.00 for the appeal of the murder conviction. Appellee admitted that he counseled and advised Rolling in connection with the burglary and murder charges. Appellee testified that he advised Rolling, at the time he was charged with the murder case, that any plea he made on the burglary charge would affect the outcome of the murder case in that Rolling would not be entitled to file an application for probation. However, Rolling testified that Appellee "advised me to plead guilty" to the burglary charge and that Appellee advised that "[t]his case [burglary] is not going to hurt my murder case."

A notice of appeal of the murder conviction was prepared by Appellee but signed only by Rolling. Also filed was a Pauper's Oath, approved on April 19, 1977. There is a Motion for an Out-of-Time Appeal filed July 17, 1979, and an approved order appointing Richard J. Jauma as the attorney for Rolling on appeal. Other than preparing the Notice of Appeal and Pauper's Oath, Appellee did no work nor did he go forward with the perfecting of the appeal, nor did he refund the $200.00 taken to represent Rolling on appeal.

We find the record shows that, as a matter of law, upon Appellee's acceptance of the $200.00 fee, inter alia, the attorney-client relationship arose. When considered with the preparation of the Notice of Appeal and the affidavit of inability to pay for a statement of facts, the Appellee, at minimum, owed a duty to properly and timely withdraw from prosecuting the appeal and to withdraw in such a manner as to not prejudice Rolling's rights.

The Motion for Out-of-Time Appeal sets out that Appellee "failed, refused, and neglected to initiate any steps toward the prosecution of said appeal." The motion stated that Rolling, on several occasions, had written directly to his counsel, Clayton Malone; however, the said counsel had "failed, refused, and neglected to respond to Defendant's letters." Defendant even had his relatives attempt to contact Malone, but they were also unsuccessful in

their attempts. The motion further stated: "It is the Defendant's desire that his case be put back on appeal since the perfection of said appeal was in no way due to the lack of diligence on the part of Defendant." The Motion for Out-of-Time Appeal was granted on July 17, 1979. There had been no action on the appeal for over two years.

At the hearing on the Motion for Out-of-Time Appeal, on September 10, 1980, the trial court said:

"THE COURT: Thirty years confinement in the Texas Department of Corrections.

"The record reflects that the Court appointed attorney advised the Court that he would represent the defendant on appeal and that he has wholly failed to prepare a brief and submit it."

At that hearing, Rolling testified that Malone had been paid a little over $2,000.00 for representation at the trial on the murder charge. Rolling was indicted on February 22, 1974, but was not tried until March, 1977, some three years later. Rolling further testified that, during the three year period, he conferred with Appellee only twice. Rolling testified that $800.00 for his appeal had been paid to the Appellee. The opinion of the Court of Criminal Appeals in the murder case is also contained within the record, showing that the murder conviction was affirmed.

Under this unusual record, we sustain Appellant's Points of Error Eleven and Thirteen. We further find, as a matter of law, that Appellee intentionally failed to seek the lawful objectives of his client, Rolling, in connection with the appeal of his murder conviction. Hence, we sustain Point of Error Sixteen. We find Point of Error Eighteen meritorious and sustain the same, finding, as a matter of law, Appellee's conduct, in connection with the appeal, was such that he failed to take certain necessary steps to avoid prejudicing Rolling's appellate rights. We find that Rolling was not given due notice; hence, Point of Error Nineteen is also sustained.

Although points of error Twelve, Fourteen, Fifteen and Seventeen, involving the great weight of the evidence and the refused issues, have merit, we find it is not necessary for us to rule on the same. They are not dispositive on appeal of Rolling's complaints. In connection with the Rolling complaint, our directive and mandate to the trial judge is that he forthwith, with all due and expeditious dispatch, enter a judgment in compliance herewith. We sever the Rolling complaint from the points remanded for another trial. We direct the court below to render on same.

## THE RICHARD JORDAN COMPLAINT

(Points of Error 21, 22, 23, 24 and 25)

In connection with the Richard Jordan complaint, we find and hold that this record demonstrates conclusively, as a matter of law, that Appellee willfully neglected preparing and submitting a written divorce decree in the Jordan matter and that the Motion for Judgment Notwithstanding the Verdict should have been granted on this issue. But this record totally fails to establish that Appellee intentionally failed to seek Jordan's lawful objectives. Nevertheless, more importantly, the district court erred in overruling Appellant's Motion for Judgment Notwithstanding the Verdict since this record shows conclusively that Appellee failed to withdraw from employment in the case after discharge.

Jordan unequivocally testified that he had employed Appellee to represent him in a divorce proceeding. The agreed fee was $350.00 and $100.00 down payment was made. After sixty days passed, he returned to obtain his divorce and had a check made out for $250.00 to pay the balance. Appellee stipulated that he had never filed a written decree in accordance with the court order of August 20, 1981, granting the divorce nor, he admitted, had he ever withdrawn from the case.

When the divorce was ready for trial and after the wife's waiver was not forthcoming, Jordan tore up the $250.00 check and fired Appellee. About eight months later Jordan hired another attorney to obtain the divorce. The new attorney said he was

unable to do anything with the case because Appellee had not withdrawn. Jordan contacted Appellee and again asked him to drop the divorce. Jordan testified that Appellee said, " 'Well, I will go right over and drop it', but he never did drop it."

In Jordan's divorce file there is a letter dated August 7, 1981, from the clerk's office which reads in part:

"Dear Mr. Malone:

"This is to advise that Judge Lynn Coker has set the above styled cause for trial on Thursday, August 20, 1981, at 9:30 A.M., in the District Courtroom, Livingston, Texas. *Judge Coker expects the Judgment to be ready for signature at the time the Divorce is heard.*

"By copy of this letter, I am notifying Mr. Richard Jordan of this trial date." (Emphasis added)

Also in the file is a certificate from the clerk stating that no decree of judgment had been filed as of March 1, 1983, although the divorce was heard, verbally granted and pronounced from the bench on August 20, 1981. It appears to us that the attorney of record should at least cooperate with the trial court in these matters when specifically requested. He had a year and six months to do so. The record glaringly proves that Appellee violated the Code of Professional Responsibility. The trial judge should consider this matter in his disciplinary ruling concerning disbarment of Appellee.

The committee vigorously argues that Appellee intentionally failed to seek Jordan's lawful objectives. The record clearly defeats this argument. Appellee told Jordan to talk to his wife, Versie. Since she did not initiate the call, Jordan called her. He swore she said: "Richard, I'll go ahead and sign that waiver providing you give me half of the money you have in the First State Bank." Immediately, Jordan went to the bank and drew out all of the money except $10.00 in the savings account and $10.00 in the checking account. Jordan admitted that Versie did not know of these withdrawals. The next day Versie came to the law office and was willing to sign the waiver. Appellee's clerk asked Jordan: "How much money you got in the First State Bank?" Jordan said he did not know. The clerk then dialed the teller at the bank who equivocated and then Jordan told them what was in the bank, "which was ten in the checking and ten in the savings, my wife walked out again and didn't sign the paper. So, I felt like I was being used and I asked his clerk to let me see the $250 check I had wrote him. And she handed [it] to me and I took it and I tore it up and I threw it in the trash basket." Jordan instructed the clerk to "[t]ell Mr. Malone that I said drop that divorce case...."

We believe that Jordan's actions concerning the monies in the accounts fall glaringly short of fair dealing. After the withdrawals by Jordan, we believe that Appellee was between the piercing horns of a dilemma. At this time, because of his own acts, we fail to perceive Jordan's lawful objectives. Since Appellee filed no brief and made no argument, we admit procedural difficulties on this point. Even so, we confidently hold that, as a matter of law, Appellee did not fail to seek Jordan's lawful objectives. We render for the Appellee on this point and disallow a remand or a new trial on same.

Appellee testified that he underwent serious heart surgery during his representation of Jordan. However, Appellee did appear with his client in court prior to Appellee's surgery. We think that the heart surgery can be considered as an extenuating or mitigating circumstance but not as a complete bar. We also think the heart surgery should be considered only on the Jordan complaint.

As written, we overrule Appellant's Points of Error Twenty-one, Twenty-two, Twenty-three and Twenty-four. We sustain Point of Error Twenty-five. We sever the Jordan complaint. We direct the court below to render on same.

### THE NELDA WALKER BRADDOCK COMPLAINT

#### (Point of Error 20)

■ Under this record and under the appropriate guidelines and criteria on ap-

peal, we hold that the Appellant's requested Special Issue BA, which inquired whether Appellee intentionally failed to seek the lawful objectives of his client, Nelda Walker Braddock, in the reissuance of citation to her husband in her divorce suit, should have been submitted as a controlling issue to the jury for their determination. On this Point of Error Twenty we reverse and remand for a new trial; but this remand does not affect those points of error on other complaints which are sustained above as a matter of law.

### THE ERNEST McKINNEY COMPLAINT

#### (Point of Error 3)

Point of Error Three complains that the district court erred in refusing to submit Appellant's requested issue inquiring whether Appellee intentionally failed to seek the lawful objectives of McKinney in connection with his client's claim for reimbursement against his deceased sister's estate for funeral expenses he had incurred. McKinney testified that he had paid around $2,000.00 in funeral expenses for his sister who died testate. According to McKinney's testimony his sister "made a will to one of our cousins and our cousins didn't pay the funeral services and I had to do it. And I employed him [Appellee] *to bring this cousin to court to answer to it for us.*" (Emphasis added) The complainant testified that he paid $200.00 for legal representation in the funeral bill matter. Complainant testified that nothing happened although Appellee told him "he would get it started." Later, the complainant wrote a letter to Appellee asking him to refund the $200.00 but never received a reply. *No claim was ever made against the estate of the deceased sister.* McKinney unequivocally claimed that Appellee provided no services at all in connection with his claim.

At trial, Appellee recalled receiving a check in the mail from McKinney and he recalled discussing the matter of the estate with him. Appellee testified that he examined all the papers in the estate and, at the time of the inventory and appraisement, it

was indicated that the funeral bill was still owed. Appellee further testified that the estate had a deficit of $8,180.89 and that he had been employed only to check the records.

Appellee testified that he did not refund the $200.00 to McKinney and admitted that he never made any demand upon the executrix of the estate. Although McKinney did not agree with the inventory and appraisement, Appellee never filed any challenge to the accounting or other actions by the executrix of the estate. Under this record, we think that the requested special issue inquiring whether Appellee intentionally failed to seek the lawful objectives of McKinney should have been submitted to the jury since the evidence raises the issue but is not conclusive thereon. The jury found that *there was an attorney-client relationship between Appellee and McKinney in connection with his sister's estate.*

We acknowledge that the State Bar Rules are to be given the same force and effect as statutes. *State Bar of Texas v. Edwards,* 646 S.W.2d 543 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.). The Code of Professional Responsibility is an integral part of the State Bar Rules. The disciplinary rules are likewise a integral part of the State Bar Rules. These disciplinary rules may be considered as statutes. In construing statutes, as well as disciplinary rules, we must look to the entire statute rather than any one isolated phrase, clause or sentence. Additionally, one provision or part will not be given a meaning or construction out of harmony or inconsistent with the other provisions. *See and compare Barr v. Bernhard,* 562 S.W.2d 844 (Tex.1978). Therefore, in connection with the McKinney complaint, requested Special Issue AD should have been submitted to the jury. Under this record—at least raised by the evidence—the failure to seek the lawful objectives of McKinney was qualitatively different, separate from and independent of wilfully neglecting an entrusted legal matter. *See TEX.REV. CIV.STAT.ANN. Title 14 App., art. 12,*

sec. 8, DR 6–101(A)(3), DR 7–101(A)(1) (Vernon 1973). We order a remand and a severance on this point of error.

■ We order that the consideration and weighing by the trial judge of Appellee's failure to cooperate, the Marjorie Beall Complaint, the Brenda Munsch Complaint, the Kenneth Rolling Complaint and the Richard Jordan Complaint be severed. We order the District Court, with dispatch, to conduct a hearing for the purpose of entering a judgment appropriately disciplining Appellee, in accordance with the law. *See TEX.REV.CIV.STAT.ANN., Title 14 App., art. 12, sec. 28* (Vernon 1973). We rule and decide that this severance and early hearing are necessary to protect the public, the public interest and the sought-after and good reputation and public relations of the vast, overwhelming majority of the lawyers of Texas.

Then, after that judgment is entered according to law, the Nelda Walker Braddock Complaint and the Ernest McKinney Complaint should be preferentially set, with a high priority, for a new trial upon remand. Again, we order and decide this procedure to protect the public, the public interest and the reputation and good public relations of the vast, overwhelming majority of the attorneys of Texas. Additionally, we mandate this procedure to effectuate the duties and actions of the Grievance Committee in their diligent and conscientious endeavors to protect the public and the public interest.

Reversed and rendered in part; reversed and remanded in part.