*1207 OPINION
By the Court,
Rose, J.:
Appellant Gary J. Davis appeals findings of fact, conclusions of law, and the decision of the Nevada Commission on Judicial Discipline (“Commission”) removing him from his judicial office as a municipal court judge. We conclude that the Commission properly acted within its discretion and affirm its determination in the matter.

FACTS

On November 22, 1993, two complaints were filed with the Commission against appellant Gary J. Davis, municipal court judge for the City of North Las Vegas.[1] Following a confidential probable cause hearing on August 2, 1995, the Commission found that there was probable cause for disciplinary action. Thereafter, a ten-count formal statement of charges was filed[2] on October 2, 1995:
*1208 1. That in violation of ARJD 11(3) and Canons 4(D)(1)(a) and 4(D)(1)(b), [appellant] borrowed money from court employees, including, but not limited to, Marilyn Bell, on January 24, 1985, the sum of $2,500.00; Linda Stiles, in August of 1993, the sum of $500.00; Don Cola, in August of 1993, the sum of $450.00; and Georgia Nunez, on repeated occasions, various sums including the sum of $500.00 on September 11, 1992, the sum of $260.00 on June 7, 1991, and the sum of $100.00 on February 21, 1991.
2. That in violation of ARJD 11(3) and Canon 5(A)(1)(b) of the Code of Judicial Discipline, [appellant], on or about August 5, 1994, publicly endorsed and campaigned for Robert Archie, a candidate for judicial office in the City of North Las Vegas.
3. That in violation of ARJD 11(3) and Canons 2, 4(D)(1)(a) and (b), [appellant] did, between the years of 1981 through 1993, conduct a personal business from [his] chambers in the North Las Vegas Municipal Court building by storing antiques therein and selling those antiques to persons likely to come before the court.
4. That in violation of ARJD 11(3) and Canons 2 and 4(D)(1)(a) and (b), [appellant] did, between 1981 and 1983, deliver [his] personal checks to the office of the clerk of [his] court and take cash from fines collected through the court, utilizing those funds for [his] own benefit for several days, and thereafter redeeming [his] personal check from the court.
5. That in violation of ARJD 11(3) and Canon 2(A), [appellant] did, from 1991 through 1993, cause to be played, from a jukebox in [his] chambers in the North Las Vegas Municipal Court building, inappropriate songs such as “Jail House Rock” and other songs related to being in prison or jail in the presence of prisoners waiting for arraignment before the court.
6. That in violation of ARJD 11(3) and Canon 2(A), [appellant] did, sometime between December 9, 1992 and February 23, 1993, take Georgia Nunez of [his] court clerk’s office and two uniformed court marshals to the automobile sales business of Friendly Ford in Las Vegas, Nevada, and there berate and intimidate an employee of that company because of [his] anger at not having yet received automobiles ordered for the court by the City of North Las Vegas, and that [he] did threaten that employee with never purchasing another vehicle from Friendly Ford.
7. That in violation of ARJD 11(3) and Canon 2(A) and Canon 4(A)(2) and (3), [appellant] did, between 1981 and *1209 1993, on multiple occasions, direct court employees, including, but not limited to Georgia Nunez and Linda Roybal, during business hours, to leave the North Las Vegas Municipal Court premises and go to the nursery business owned by [his] mother to provide Spanish translating services, and that [he] did direct other court employees, including Don Cola and Linda Stiles, to perform other personal errands for [him] during court hours.
8. That in violation of ARJD 11(3) and Canons 1, 2(A) and 4(C)(3)(b)(i) & (iv), [appellant] did, from March, 1991 through February, 1992, direct or suggest to persons appearing before the North Las Vegas Municipal Court and having been found guilty by that court, to contribute to certain charities in lieu of paying fines to the City of North Las Vegas, thereby diverting money from the city treasury of North Las Vegas, which diversion was ordered partially for the purpose of enhancing [his] electability.
9. That in violation of ARJD 11(3) and Canons 2 and 3(B)(7), [appellant] did, on the 29th day of May, 1990, conduct an ex parte meeting with Patricia Brown, a defendant appearing before [him] that day, outside of the presence of the City Attorney of North Las Vegas, prior to the matter being heard in open court.
10. That in violation of ARJD 11(2) and ARJD 11(3) and Canons 1 and 2(A), [appellant] did, commencing in December 1993 and continuously thereafter, willfully and deliberately use property owned in part by [appellant] in North Las Vegas, Nevada that was zoned for residential purposes, for commercial purposes, after having been personally advised in writing by the Community Planning and Development Department of the City of North Las Vegas on July 14, 1993 of the proper zoning for that property. Further in conjunction with [the] commercial usage of this property, [he] did willfully and deliberately trespass on the property of the adjoining property owner for the purposes of hooking up water and sewer lines.
A formal hearing convened on November 2, 1995, and concluded the following day. The Commission then issued its final report, findings of fact, conclusions of law, decision, and imposition of discipline on December 4, 1995. The Commission found that clear and convincing evidence supported the factual allegations contained in each count of the formal statement of charges, with the exception of Count 9 (ex parte communication with defendant Patricia Brown). Additionally, the Commission concluded that these facts established violations of the specific provisions of the Nevada Code of Judicial Conduct (“NCJC”) alleged *1210 in each count and that these violations constituted grounds for discipline.
The Commission also concluded that, although the conduct alleged in Count 4 (check cashing) had been established, appellant had discontinued the practice in a timely fashion; therefore, discipline would be inappropriate. The Commission was particularly concerned with Count 10, which it described as “particularly egregious” because appellant “deliberately and knowingly violated the very ordinances that he is obligated to enforce.” Additionally, the Commission considered appellant’s conduct at the formal hearing as “clearly and convincingly demonstrat[ing] his contumacious and contemptuous behavior towards the Commission.”[3] By a vote of six of the seven Commissioners, the Commission ordered appellant’s immediate removal from office.
Commissioner Michael R. Griffin filed a dissent to the imposition of discipline. Although Commissioner Griffin agreed with the Commission’s findings, he concluded that removal from judicial office was unduly severe. Instead, he suggested that appellant’s misconduct warranted substantial sanctions including a censure, attendance at an ethics course, and a fine. However, Commissioner Griffin stated “there is a serious question whether the Commission could impose lesser types of discipline on a Municipal Court Judge for conduct which occurred before the adoption of the recent amendments to the Nevada Constitution concerning the powers of the Commission.”
On appeal, appellant seeks relief from the Commission’s decision based upon the following grounds: (1) that the Commission lacked jurisdiction to impose discipline on a municipal judge; (2) that the Commission’s rules violated his due process rights because there is no limitations period prescribing the time within which a complaint must be filed; (3) that the Commission improperly considered his assertion of a blanket Fifth Amendment privilege in deciding the appropriate discipline; (4) that the Commissioners who participated in the probable cause hearing were prejudiced against him and, therefore, should not have participated in the formal hearing and decision; (5) that the charges were not established by clear and convincing evidence; (6) that the charges did not constitute violations of the NCJC; and (7) that the discipline imposed was excessive.

*1211
DISCUSSION

We initially address the threshold issue of the Commission’s jurisdiction to discipline a municipal court judge. The constitutional provision approved by the voters in 1976 created the Commission and provided that “[a] justice of the supreme court or a district judge may ... be censured, retired or removed by the Commission on judicial discipline.” Nev. Const, art. 6, § 21(1) (emphasis added). In 1977 the legislature enacted NRS 1.440(1), which provides:
1. The Commission on judicial discipline has exclusive jurisdiction over the censure, removal and involuntary retirement of justices of the peace and judges of municipal courts which is coextensive with its jurisdiction over justices of the supreme court and judges of the district courts and must be exercised in the same manner and under the same rules.
(Emphasis added.) In 1994, paragraph 1 of section 21 of article 6 of the Nevada Constitution was amended to read: “A justice of the supreme court, a district judge, a justice of the peace or a municipal judge may ... be censured, retired, removed or otherwise disciplined by the commission on judicial discipline.” (Emphasis added.)
Appellant contends that the Commission lacked jurisdiction over municipal court judges prior to the 1994 constitutional amendment and, therefore, the Commission lacked authority to discipline him for conduct prior to 1994. Appellant’s contention rests upon two assumptions: (1) NRS 1.440 was unconstitutional; and (2) retroactive application of the 1994 constitutional amendment to pre-1994 conduct violates the prohibition against ex post facto laws.

Constitutionality of NRS 1.440

The legislative history of NRS 1.440 is silent regarding the legislature’s authority to enact the legislation.[4] The Commission contends that subparagraph 9(d) of section 21 of article 6 of the Nevada Constitution provides adequate constitutional authority *1212 for the legislature to enact NRS 1.440. The referenced provision states that the Commission may “[ejxercise such further powers as the legislature may from time to time confer upon it.” Nev. Const, art. 6, § 21(9)(d). The Commission compares this provision to article 6, section 8, which allows the legislature to define the jurisdiction of the justices’ courts. The Commission also contends that subparagraph 9(d) should be read to allow the legislature to give the Commission the power to discipline municipal court judges because municipal courts are legislatively created.[5]
Appellant contends that subparagraph 9(d) of section 21 of article 6 may not be read to permit the legislature to expand the constitutionally-defined jurisdiction of the Commission.[6] Appellant further argues that the 1994 constitutional amendment supports his interpretation of the legislature’s lack of authority because the amendment would only have been necessary if NRS 1.440 were unconstitutional. We disagree.
The interpretation of article 6, section 21 (9)(d) is a question of first impression for this court. Although the 1994 amendment thereto facially expands the scope of the Commission’s powers to include municipal court judges and justices of the peace, in actuality, the amendment simply clarified the legislature’s then existing authority to render these judicial officers subject to Commission discipline. Thus, the promulgation of NRS 1.440(1) by the 1977 Nevada legislature was within its constitutional prerogatives.
While article 6, section 21, in its original form, clearly and unambiguously vested the Commission with authority to discipline supreme court justices and district court judges, article 7, section 4 of the Constitution gave the legislature the mandate to *1213 provide for the removal from office any civil officer other than those in “this article previously specified” for malfeasance or nonfeasance in the performance of official duties. This court has interpreted article 7, section 4 as authorizing the legislature to provide by statute for the removal of district, county and township officers. Robison v. District Court, 73 Nev. 169, 172, 313 P.2d 436, 438 (1957). In Gay v. District Court, 41 Nev. 330, 336, 171 P. 156, 157 (1918), this court relied upon section 4 of article 7 in upholding a statute giving district courts authority to remove certain public officers. Further, under this authority, the legislature had the option of setting removal guidelines. Thus, when article 6, section 21(9)(d) and article 7, section 4 are read together, it is apparent that the legislature was free to utilize the Commission as a medium for that purpose. Because the power of removal in this particular context also implies authority in the Commission to impose lesser sanctions, we hold that the Commission did have jurisdiction to either remove or impose any measure of discipline, including removal, in this matter. This is consistent with the opinion of the Attorney General’s office that Nevada Constitution article 7, section 4 provided ample authority for the legislature to enact NRS 1.440. Op. Nev. Att’y. Gen. No. 81-4, at 20 (March 3, 1981). The 1994 amendment to the Nevada Constitution served the important purpose of clarifying the powers of the Commission as they existed as of the enactment of NRS 1.440.[7]
Appellant also contends that constitutional prohibitions against ex post facto application of laws prohibits the imposition of discipline for conduct predating the 1994 constitutional amendment. Because we hold that the Commission’s power stems from the 1977 legislative enactment of NRS 1.440, we decline to reach this issue.[8]
Having concluded that there are no ex post facto issues to be resolved in this controversy, and having held that the 1977 enactment governs these proceedings, it follows that appellant may be disciplined under the specifications of charges unless the conduct in question has been rendered invulnerable to Commission review by prescription. The ARJD do not include a period of limitations within which a complaint must be filed with the Commission.
*1214 In contrast to Commission proceedings, “[formal disciplinary proceedings shall not be commenced against an attorney for alleged misconduct occurring more than 4 years prior to the filing of the complaint by bar counsel.” SCR 106. Appellant argues that “the failure to observe any reasonable limitation of actions violated his right to due process.”[9] As sole authority for his premise, appellant cites Bowen v. New York, 476 U.S. 467, 481 n.13 (1986), wherein the Supreme Court explained that statutory limitation periods are a recognition that “the right to be free of stale claims in time comes to prevail over the right to prosecute them.” Appellant further suggests that the two-year limit set forth in NRS 11.190(4)(b)[10] would be appropriate because judicial discipline is in essence a penalty or forfeiture.
The Commission disagrees, contending that: (1) NRS 11.190(4)(b) is wholly inapplicable because a disciplinary proceeding before the Commission is not the same as a civil cause of action upon a statute for a penalty or forfeiture; (2) there is no constitutional right to a “reasonable limitations period”; and (3) the judicial office is so important that all conduct while in office must be subject to scrutiny. Finally, the Commission notes that it took into consideration the remote occurrence of some of the alleged conduct and did not discipline appellant for charges based solely on distant conduct.
Appellant’s reliance on Bowen is misplaced. Bowen is not directly on point; it does not stand for the proposition that due process requires a limitations period. Rather, courts have recognized that statutory limitation periods are measures of public policy entirely subject to the will of the legislature. See, e.g., State v. Numm, 768 P.2d 268 (Kan. 1989); State v. Hodgson, 740 P.2d 848 (Wash. 1987), cert. denied, 485 U.S. 938 (1988). Moreover, according to one treatise, most states do not have a limitations period that would proscribe the investigation of a judge’s conduct occurring in the distant past. Judith Rosenbaum et al., Practices and Procedures of State Judicial Conduct Organizations ch. 2, at 15 (1991).
Although the doctrine of laches could be indiscriminately applied in the absence of an express limitations period, the Commission took an appropriately practical approach in consid *1215 ering the date of the alleged misconduct and whether appellant had cured the misconduct. The Commission did not consider remote acts unless they were a part of a recurring pattern of conduct. We are convinced that this approach addresses and resolves any fundamental due process concerns. We therefore conclude that the absence of a limitations period did not violate appellant’s due process rights.

Fifth Amendment Concerns

At the formal hearing, the special prosecutor called appellant as a witness. After initially refusing to take the oath, appellant was sworn and then asserted a blanket Fifth Amendment privilege. Even after his attorney and the Commission directed him to answer the non-incriminating questions, appellant continued to refuse to answer most of the questions posed to him, including non-incriminating questions such as, “When were you first elected?”
The Commission made the following relevant finding of fact:
That [appellant], while testifying at the Formal Hearing on November 3, 1995, wrongfully asserted his Fifth Amendment right by refusing to answer simple, non-incriminating questions .... [Appellant’s] behavior and attitude displayed when called to testify at the Formal Hearing was both contumacious and contemptuous.
Based on these facts, the Commission concluded that appellant’s conduct violated ARJD 4, ARJD 11(3) and Canon 2(A). Additionally, the Commission dedicated almost two pages of its decision to a discussion of appellant’s conduct at the formal hearing and concluded by stating that he should be removed from office. The final paragraph of the Commission’s decision in the final report states:
The Commission emphasizes that in determining that the appropriate discipline for [appellant’s] offenses is removal from office, it has not taken into consideration [appellant’s] wrongful assertion of a blanket Fifth Amendment privilege. Since Rule 11 which establishes the grounds for discipline does not provide that a wrongful assertion of a blanket Fifth Amendment privilege is disciplinable conduct, the Commission would not discipline [appellant] for doing so without first giving him the opportunity to remedy that conduct. However, the Commission deems it appropriate to inform the judiciary that not only does a judge not have the right to assert a blanket Fifth Amendment privilege and refuse to cooperate with the Commission or testify when called as a *1216 witness before it, but that in the event a judge does so in the future, the Commission will deem such non-cooperation to be an act of misconduct, subjecting the judge to discipline. The Commission has taken into consideration the manner in which [Appellant] behaved in wrongfully asserting a blanket Fifth Amendment privilege, but not the fact that he wrongfully refused to testify in determining that removal is the appropriate discipline to be imposed.
(Emphasis added.)
Appellant impliedly argues that it was improper for the Commission to consider the manner in which he asserted his Fifth Amendment rights in determining the appropriate disciplinary action to take. Thus, appellant suggests that “the only issue on review is whether [APPELLANT] was required to humble himself before the Commission and whether his failure to do so should have been considered as a part of the ultimate decision.”
The Commission concedes that appellant would have a Fifth Amendment right to refuse to testify on a question-by-question basis where he had a plausible claim of self-incrimination. The Commission further concedes that it would be inappropriate to consider the rightful invocation of Fifth Amendment rights, see Spevack v. Kline, 385 U.S. 511 (1967), but that the Commission could, although it did not, consider the wrongful assertion of Fifth Amendment rights. See State v. Malone, 692 S.W.2d 888 (Tex. Ct. App. 1985).
Having found in the context of the formal hearing that appellant wrongfully asserted his Fifth Amendment privileges, the Commission was entitled to consider that fact along with the severity of the offenses in determining the extent and type of appropriate discipline. Thus, the Commission was not restricted to a consideration of the “manner in which Judge Davis behaved in wrongfully asserting a blanket Fifth Amendment privilege.” In this connection, we find that all of appellant’s due process rights were protected by the Commission when it considered the issue and ultimately determined that the assertion of the privilege was wrongful.
Additionally, we conclude that the Commission rightfully considered appellant’s demeanor at the hearing in the process of determining the appropriate sanctions to be imposed.
In this case, the Commission could have reasonably concluded that appellant’s sophomoric and arrogant behavior was calculated to “poison the well” so that the fairness and validity of the Commission proceedings would be obscured on review. His contention on appeal that he is entitled to relief because he was required to “humble himself” is a clear sign that he had, to a *1217 degree, lost touch with a proper sense of his public trust and decorum. Certainly, he would never have tolerated such behavior in any proceeding over which he was charged with presiding. His approach to the hearing, whether or not a predetermined strategy, cannot be condoned. While we believe that his general behavior and the specific manner in which he invoked his Fifth Amendment privilege should have been disregarded in terms of whether imposition of discipline was justified on any specified charge, appellant’s behavior was relevant, to a limited degree, to the deliberations over the nature of discipline imposed.

Commission Bias

Pursuant to ARJD 3(6), the respondent judge may challenge any member of the Commission for cause. The Commission must hear the challenge and
may disqualify any Commissioner who by reason of actual or implied bias would . . . either be prevented from adjudicating the matter in a fair and impartial manner or, by reason of facts creating an appearance of impropriety, be prevented from adjudicating the matter in a manner consistent with maintenance of public confidence in the Commission.
Id. “A challenge for implied bias must be allowed on a showing of any of the grounds relating to jurors which are enumerated in NRS 16.050.” ARJD 3(7).
Prior to the formal hearing, appellant filed a motion to disqualify Commission members Frank Brasa, Drennan A. Clark, Billy Gene Fuller, Michael R. Griffin, Alan J. Lefebvre and Sally Loehrer. The Commission denied the motion.
On appeal, appellant contends that because the Commissioners who sat at the preliminary hearing determined that perjury charges should be investigated and filed against him based upon his testimony at the preliminary hearing,[11] they “could not reasonably be perceived to be unbiased.”
*1218 The Commission disagrees, arguing that in the absence of actual bias, there is nothing improper about combining investigatory, prosecutorial and adjudicatory powers in one body. The Commission cites Withrow v. Larkin, 421 U.S. 35 (1975), wherein the Supreme Court held that the combination of investigatory, prosecutorial and adjudicatory powers in a medical discipline panel did not violate the Administrative Procedure Act or due process of law. The Larkin Court explained:
Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge’s presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence.
Id. at 56.
However, in his reply brief, appellant’s position was clarified as follows:
Contrary to the Commission’s understanding of the argument, [APPELLANT] does not contend that the Commission was inevitably biased against him simply because it combines investigative, prosecutorial and adjudicative functions. Instead, it was the facts and circumstances of this particular case which realized the “potential for unfairness” identified by this Court in Rudin v. Nevada Real Estate Advisory Commission, 86 Nev. 562, 565, 471 P.2d 658, 660 (1970).
The Commission’s conclusion that there was probable cause to believe appellant had committed perjury during the probable cause hearing does not necessarily demonstrate actual or implied bias on the part of the Commissioners who made the probable cause determination. Probable cause determinations are by no means a determination of guilt. Proof by clear and convincing evidence that appellant had committed perjury would still be required at the formal adjudicatory level. Thus, the fact that some of the Commissioners previously had found there was probable cause to believe appellant had committed perjury does not require that they be disqualified from participating in the formal hearing.

*1219
Whether findings were supported by clear and convincing evidence

Appellant argues that the Commission’s factual findings were not supported by clear and convincing evidence and that he did not violate the Nevada Code of Judicial Conduct.[12]

Standard of Review

In reviewing the Commission’s findings of fact, this court is confined to a determination of “whether the evidence in the record as a whole provides clear and convincing support for the Commission’s findings.” Goldman v. Nevada Comm’n on Judicial Discipline, 108 Nev. 251, 267, 830 P.2d 107, 118 (1992); see ARJD 27. Moreover, “[t]he Commission’s factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact.” Goldman, 108 Nev. at 267, 830 P.2d at 118. However, this court is not bound by the Commission’s conclusions of law. Id. Thus we turn to an analysis of the charges at issue.

Count 1: Loans from employees

The Commission concluded that appellant’s practice of borrowing money from court employees violated NCJC Canon 4(D)(1)(a) and constituted grounds for discipline under ARJD 11(3). On appeal, appellant contends that it was common practice within the North Las Vegas Municipal Court to loan money to coworkers, and that his conduct was not a violation of NCJC Canon 4(D)(1)(a)[13] because none of the employees testified that appellant exploited his position to obtain loans. Appellant also argues that the allegations are not grounds for discipline under ARJD 11(3) because his conduct was not in the “performance of judicial or administrative duties.”
The Commission contends that the evidence clearly and convincingly demonstrates that appellant “was exploiting his position by requesting employees to loan him money.” The Commission specifically points to Marilyn Bell’s testimony that appellant was late in repaying a loan from her and that, after her *1220 husband threatened to involve the media, appellant repaid the loan with 2,500 one-dollar bills. We conclude that the evidence presented gives the Commission a substantial basis to find by clear and convincing evidence that Canon 4D(l)(a) was violated by appellant using his position to secure substantial loans for lengthy periods of time without paying interest and refusing to repay the loan when requested.

Count 2: Political campaigning

The Commission found that appellant publicly endorsed and campaigned on behalf of Robert Archie, a candidate for justice of the peace of the North Las Vegas Township, in violation of NCJC Canon 5(A)(1)(b).
Our review of the record reveals that the evidence clearly and convincingly establishes that appellant publicly endorsed Archie for public office in violation of Canon 5(A)(1)(b). A videotape in evidence shows appellant approaching and knocking on the door of a house on Tonopah Street in North Las Vegas while wearing an Archie campaign shirt. The homeowner in question testified that she did not know appellant. Additionally, appellant was seen with a group of people going door-to-door and personally erecting campaign signs. Appellant explained, unconvincingly, that he merely walked his neighborhood with Archie, introducing Archie to people he knew. Clearly, he was doing more than just privately voicing his support for a candidate.
Pursuant to ARJD 11(3), grounds for discipline include “[a]ny acts or omissions in the performance of judicial or administrative duties which contravene express provisions of the [NCJC].” The NCJC proscribes conduct relating to both judicial activities and extra-judicial activities. Despite the ambiguity existing in ARJD 11(3) referring to “acts or omissions in the performance of judicial or administrative duties,” we interpret the rule to include extra-judicial activities proscribed under the NCJC. We therefore conclude that appellant’s campaign activities violated ARJD 11(3).

Count 3: Personal business in chambers

The Commission found that appellant used his chambers to conduct personal business by storing antiques in the courthouse, by selling those antiques to persons with whom he came in contact at the courthouse, and by using court employees to move antiques. The Commission concluded that this conduct violated NCJC Canons 2 and 4(D)(1)(a). Appellant contends that the record does not support the finding of a violation of the canons because there was insufficient evidence to establish a “business” *1221 (i.e., the testimony established four or five sales over 16 years), and there was no evidence demonstrating that he was perceived to be exploiting his judicial position.
Photographs admitted into evidence depict a vast “inventory” of antiques. Further, his testimony that he merely enjoyed having them displayed is virtually beyond belief. Although testimony established only a few sales to court employees and an attorney who saw one of appellant’s pieces at an antique shop and discussed a purchase with appellant in chambers, we conclude that sufficient evidence was presented in support of this charge.
Count 6:[14] Incident at Friendly Ford
The Commission found that appellant took two uniformed marshals to Friendly Ford where he berated and intimidated an employee with a threat that the City of North Las Vegas would never purchase another vehicle from Friendly Ford because the court had not yet received ordered vehicles. The Commission concluded that this constituted a violation of NCJC Canon 2 and was grounds for discipline under ARJD 11(3).
Appellant argues that there was insufficient evidence to support the finding that he berated and intimidated the Friendly Ford employee. He also contends that his conduct was not a violation of Canon 2 because, as chief purchasing agent for his court, he did nothing other than express his dissatisfaction with the dealership’s performance. Appellant thus insists that his conduct did not impugn public confidence in the “integrity and impartiality of the judiciary.”
Georgia Nunez testified that it was her perception that appellant berated and intimidated the dealership’s employee and that after the incident appellant had said that he probably overreacted. The commentary to NCJC Canon 2 states, “Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. ... A judge must expect to be the subject of constant public scrutiny.” Additionally, the commentary explains that “[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge’s ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.”[15] However, keeping in mind *1222 the thrust of ARJD 11(3) that the NCJC is to be read strictly in favor of the judicial officer, and the preamble to the NCJC providing that not all violations of the code warrant discipline, we conclude that appellant’s ill-advised conduct does not constitute a sufficiently serious violation of NCJC Canon 2 to warrant discipline.

Count 7: Using court employees for personal business

The Commission found that appellant used court employees to drive him to work, to perform translating services at his mother’s nursery business, and to accompany him while he looked for antiques. The Commission concluded that this conduct violated NCJC Canons 2, 2(A), 4(A)(2), and 4(A)(3).
Appellant contends that the alleged conduct should not be construed as a violation of NCJC Canon 2(A), i.e., that the conduct demeaned the judicial office or interfered with the proper performance of judicial duties. He points to the following testimony as support. Don Cola, an employee of the court, testified that over a year and a half before the hearing, appellant stopped taking him to look at antiques. Linda Stiles testified that she only ran errands for the judge on her own time.[16] Yolanda Roybal testified that she went to the nursery to interpret for a Spanish-speaking employee once in the early 1980’s as a favor to appellant, and that it could have been on her lunch break, although she could not remember. Georgia Nunez testified that she translated at the nursery three or four times in 16 years. Marshal Kevin Nitzschke testified that he drove the judge to work for security reasons.
Although some of the testimony indicated that personal errands were undertaken during lunch breaks, there was also competent testimony that the excursions relating to antiques would last up to two hours several times a week. Accordingly, we conclude that clear and convincing evidence established that this conduct constituted a violation of NCJC Canon 4(A)(3). However, we are not persuaded that these activities constituted a violation of NCJC Canons 2(A) and 4(A)(2). Such conduct does not clearly demonstrate that appellant did not respect or comply with the law or that this behavior demeaned the judicial office.

Count 8: Contributions in lieu of fines

The Commission found that appellant suggested that criminal defendants contribute money to charities on a list he had prepared *1223 in lieu of paying fines to the City of North Las Vegas and that he did so, in part, to enhance his electability. The Commission concluded that this conduct violated NCJC Canons 1, 2, 2(A), and 4(C)(3)(b)(i) & (iv), and constituted grounds for discipline under ARJD 11(3).
Appellant contends that no evidence was presented in support of the finding that he used this practice to enhance his electability. He further argues that he did not believe it was a violation of Canon 4(C)(3) because the defendants had a choice as to whether to contribute and which charity would receive the contribution. Finally, appellant points out that he discontinued the practice after he was informed that an opinion of the Attorney General stated that it was unethical and that the Nevada Supreme Court did not approve of the procedure.
We conclude that appellant’s conduct violated NCJC Canon 4(C)(3). “The rule addresses the dual fears that potential donors either may be intimidated into making contributions when solicited by a judge, or that they may expect future favors in return for their largesse.” Jeffrey M. Shaman et al., Judicial Conduct and Ethics § 9.06, at 289 (2d ed. 1995). This treatise also directs our attention to unreported decisions wherein judges were disciplined for conduct similar to that presently under scrutiny. In one case, the judge disposed of cases by requiring the defendant to contribute stated amounts to charities named by the judge. In another, the judge allowed defendants to make voluntary contributions to law enforcement services in exchange for dismissal of traffic infractions. Id. at 290 nn.40-41. Accordingly, we conclude that appellant violated NCJC Canon 4(C)(3). Further, this conduct violated the other canons identified by the Commission.

Count 10: Zoning violation and trespassing

The Commission found that appellant willfully and knowingly used property which he partly owned for commercial purposes when said property was zoned for residential use, and that he caused his agent (a subcontractor) to trespass on adjoining property to hook up water and sewer lines.
The Commission also found that appellant testified falsely during the probable cause hearing as to who owned the trees stored at the property in question. The Commission concluded that appellant’s conduct violated NCJC Canons 1, 2, and 2(A) and constituted grounds for discipline under ARJD 11(2) and 11(3). Appellant contends that there was no evidence that the trees stored on the property belonged to him and that he never intended to use the property as a commercial growing yard. Appellant also insists that he did not instruct his subcontractor in *1224 any way regarding the water and sewer hookup and assumed that all permits had been obtained by the subcontractor. Finally, he maintains that his conduct did not violate the canons and that he did not trespass on the adjoining property.
The evidence adduced on this charge is somewhat equivocal. The Davis Family Trust purchased a parcel of real property located at West Craig Road in North Las Vegas in which appellant and his mother each owned a one-half interest. The property is zoned for residential use only. Appellant’s brother, Don Davis, testified that the property was purchased in the hope that it would later be zoned commercial and could then be resold.[17]
According to Don Davis, he offered to purchase property in Moapa in May of 1993, which he wanted to use as a growing yard; however, the purchase did not close until February 1995. As part of a joint venture, his mother purchased trees in November 1993, which Don Davis hoped to grow on the Moapa property. The trees were delivered to the Craig Road property in the spring of 1994 because the Moapa property had not closed and was not ready to receive the trees.
In response to an inquiry by appellant, Don Brown, the developing director for the City of North Las Vegas, notified appellant in July 1993 that the Craig Road property was zoned residential and opined that the property would not be eligible for rezoning. Thereafter, Brown received a complaint from Harry Segal, an adjoining landowner (a developer), that the Craig Road property was being used as a nursery. Brown investigated and concluded that the allegations were unfounded. Nevertheless, Brown continued to drive by the property periodically and eventually began to suspect that the property was being used for purposes other than residential use. In December 1993, Brown informed appellant that a complaint had been filed. Appellant complied with a settlement agreement with Chief Deputy City Attorney Mark Zaloras for the removal of the trees (approximately 1,100)[18] over a period of time. Zaloras testified that there was nothing unusual about the case and that he did not perceive that appellant tried to use his status as municipal court judge in the jurisdiction where Zaloras practiced. The Commission found appellant’s conduct with regard to the zoning violation and two-year delay[19] in remov *1225 ing the trees to be particularly egregious because he was violating the very ordinances which he was charged with enforcing.
As to the trespass, Don Davis testified that he never gave his contractor permission to connect a sewer line or to break through a wall on his property to do so. The Engineering Projects Coordinator for the City of North Las Vegas testified that when she pulled the permit she was not aware that appellant was involved and that she mistakenly indicated on the permit that it was pulled for Segal’s development. She also testified that she did not think a private right-of-way would have been necessary. Mr. Segal testified that sometime after the Craig Road property was being investigated based upon Segal’s complaint, appellant approached him, asked him to support rezoning the Craig Road property, and then asked for a $5,000 campaign contribution.[20] Appellant allegedly told Segal that he was going to make the property a nursery and said, “I can do everything in Las Vegas. Las Vegas is in my small pocket. I can do whatever I wish.” He also threatened to put pigs and chickens on his property if Segal did not support the rezoning effort.
We conclude that the evidence regarding the trespass is inconclusive. However, the Commission obviously believed the testimony of Segal and his account of the events and statements by Davis; and this establishes that appellant abused and impugned his judicial office. With respect to the zoning issue, clear and convincing evidence establishes that appellant violated NCJC Canons 1 and 2(A) by failing to comply with the law even after he had been advised of the zoning violations. Despite any problems with his brother’s Moapa property, appellant should not have allowed the zoning violation to occur in the first place. Thus, his conduct does tend to implicate the integrity of the judiciary. We therefore conclude that the Commission’s findings and conclusions with respect to the zoning violation are supported by clear and convincing evidence and that the conduct warranted discipline.

Appropriate sanctions

As the Goldman court recognized, the Nevada Constitution expressly authorizes this court to reverse the sanction imposed by the Commission or “take any alternative action provided in this subsection.” Goldman, 108 Nev. at 267, 830 P.2d at 118 (quoting Nev. Const, art. 6, § 21(1)). “Thus, on appeal, we are specifically enjoined by the constitution to exercise our independent judgment regarding the appropriate sanction warranted by factual *1226 findings properly adduced by the Commission.” Id. at 268, 830 P.2d at 118.
Appellant argues that the discipline imposed, removal from office, was excessive. He suggests that removal was excessive because none of the alleged conduct evidenced that he misused his office for his own personal gain or profit or that he ignored the rights of litigants appearing before him. He concludes that the alleged conduct “represents] human failings without any intention of purposeful misconduct which would justify imposition” of such severe sanctions.
The Commission responds that it had no other choice than to order appellant’s removal from office because the evidence established that he treated his office “as a personal fiefdom.” According to the Commission, the videotape of appellant’s appearance at the formal hearing is the best evidence of “the contempt with which he treated his public trust.”
The record supports the Commission’s interpretation. Thus, while many of the charges would not sustain removal standing alone, the totality of the sustained charges, appellant’s wrongful assertion of privilege and his contumacious demeanor at the hearing demonstrated that the totality of the offenses, sustained by clear and convincing evidence, justified appellant’s removal from office.
The dissent asserts that possible abuses of the appellate process have occurred, but its claim is supported only by speculation. This case was processed by following normal procedures of this court and was unusual only in that one retiring justice was replaced by his successor. What is unusual is that now Justice Springer improperly discloses what he remembers to be the vote taken in this case immediately after argument and a draft opinion prepared by one justice. Disclosing this information breaks a long-standing rule of court confidentiality in the decision-making process. This court recognized that rule when a majority of the court, including Justice Springer, admonished a fellow justice for disclosing that staff had prepared the conclusion in an opinion. State of Nevada v. District Court, 108 Nev. 1030, 842 P.2d 733 (1992) (disclosing that the dissent’s statement that staff reached the conclusion in an opinion revealed confidential court information and breached long accepted standards of collegiality). Here, Justice Springer is not only disclosing a preliminary draft but also portions of the initial deliberations in an inaccurate manner.
Justice Springer’s claim that he has some sort of duty to disclose the confidential processing of this case also misses the mark. He argues that in fairness to Davis, it is necessary to show *1227 that Davis would have won this appeal if it was decided immediately after oral argument when a preliminary vote was taken. Besides the fact that this is not how this court operates, preliminary votes are tentative and often subject to further review of applicable law and the facts of the case. Justices often change their initial vote after further consideration. Justice Springer concedes as much. There is absolutely no valid reason to disclose the internal processing of Davis’ appeal. Nothing improper happened in deciding this case, and Justice Springer discredits himself and this court to so suggest.
The dissent also suggests that the Commission selectively prosecuted Judge Davis and that judges who the Commission brings to a full public hearing might become “victims of irrational and discriminatory Commission excesses.” It cites a number of complaints made to the Commission that were not pursued to a final hearing. Without knowing the facts and documents available to the Commission, it is impossible to determine the validity of the Commission’s action, and this criticism is simply a regurgitation of Justice Springer’s prior criticism of the Commission. See Whitehead v. Comm’n on Jud. Discipline, 111 Nev. 1459, 1467-69, 908 P.2d 219, 222-23 (1995). Suffice it to say, we are aware of no selective prosecution of former Judge Davis, and there was ample evidence to show that he repeatedly abused his position as a municipal court judge and used it for his own personal benefit.

CONCLUSION

We conclude that the Commission had jurisdiction to consider appellant’s pre-1994 conduct; that there is no due process right to a period of limitations within which a judicial discipline complaint must be filed; and that the Commission properly considered the fact of and the manner in which appellant asserted his Fifth Amendment rights when considering appropriate disciplinary measures.[21]
Shearing, C. J., and Young, J., concur.
APPENDIX
1. Grounds for discipline
The grounds for discipline are set forth in ARJD 11. In this case, the Commission relied upon two of the five grounds listed:
2. Any acts or omissions amounting to any public offense *1228 which tend to corrupt or to impair the administration of justice in any court. [22]
3. Any acts or omissions in the performance of judicial or administrative duties which contravene express provisions of the Nevada Code of Judicial Conduct. When applied for purposes of determining whether misconduct has occurred, the provisions of the Nevada Code of Judicial Conduct must, considered as penalty provisions, be strictly construed in favor of the respondent judge.
2. NCJC Canons found to have been violated
Canon 1 provides:
A judge shall uphold the integrity and independence of the judiciary.
Canon 2 provides:
A judge shall avoid impropriety and the appearance of impropriety in all of the judge’s activities.
Canon 2(A) provides:
A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Canon 4(A) provides, in relevant part:
A judge shall conduct all of the judge’s extra-judicial activities so that they do not... (2) demean the judicial office; or (3) interfere with the proper performance of judicial duties.
Canon 4(C)(3)(b) provides, in relevant part:
A judge . . . shall not personally participate in the solicitation of funds, or other fund-raising activities . . . [and] shall not use or permit the use of the prestige of judicial office for fund-raising or membership solicitation.
Canon 4(D)(1)(a) provides in relevant part:
A judge shall not engage in financial and business dealings that:
(a) may reasonably be perceived to exploit the judge’s judicial position, or ... .
Canon 5(A)(1)(b) provides in relevant part:
Except as authorized in Sections 5(B)(2) and 5(C)(1) a *1229 judge or a candidate for election or appointment to judicial office shall not:
(b) publicly endorse or publicly oppose another candidate for public office.

 The complaints were filed by Georgia Nunez and Marilyn Bell. Nunez had been working at the municipal court as a clerk when appellant first took office. Over time, appellant promoted Nunez until she became the court administrator in 1988; however, on October 7, 1993, appellant fired Nunez. Marilyn Bell had worked in various positions, including court clerk, at the municipal court. She began working there before appellant took office, and she retired on January 31, 1995. Bell and Nunez were close friends. Nunez also has a civil suit pending against appellant and the City of North Las Vegas.

 The Commission hired Frank J. Cremen to act as the special prosecutor; he filed the formal statement of charges as a public document, as required by the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline (“ARJD”) Rule 16. At that point, as specified by the rule, all confidentiality ceased.

 Appellant asserted a blanket Fifth Amendment right to refuse to answer virtually all questions addressed to him by the Commission. Given the extent to which appellant withheld his cooperation in the hearing, it is readily understood why his actions were viewed as being disdainful of the Commission.

 Testimony before both judiciary committees of the Assembly and Senate in support of the legislation indicated the intent was to bring the courts of limited jurisdiction under the Commission’s jurisdiction as a step toward a uniform court system. See Assembly Judiciary Committee Minutes on S.B. 453, 59th Legislative Session, at 3 (April 20, 1977) (testimony of Judge Richard Minor, justice of the peace and president of the Nevada Judges Association); Senate Judicial Committee Minutes on S.B. 453, 59th Legislative Session, at 797 (April 12, 1977) (same).

 Pursuant to section 1 of article 6 of the Nevada Constitution, “[t]he Legislature may also establish, as part of the system, Courts for municipal purposes only in incorporated cities and towns.”

 Appellant also argues that reading subparagraph 9(d) to allow the legislature to expand the Commission’s jurisdiction would be a delegation of power in violation of the separation of powers doctrine. Appellant cites City of North Las Vegas v. Daines, 92 Nev. 292, 550 P.2d 399 (1976), and Dunphy v. Sheehan, 92 Nev. 259, 549 P.2d 332 (1976), in support of his position. Both cases provide general statements about the separation of powers doctrine; however, neither case is particularly assistful in this analysis. In Daines, this court held that a municipal judge possessed the inherent power to dismiss the municipal court administrator. In Dunphy, this court noted, out of deference to the doctrine, that the legislature excluded members of the judiciary from the Ethics in Government Law. We conclude that appellant’s separation of powers argument is meritless.

 Even though the ballot question explanation stated the purpose of the amendment was designed to add justices of the peace and municipal judges to the ambit of Commission authority, the explanation does not have the force of law.

 We would note that the prohibitions against ex post facto laws generally are not implicated by non-criminal proceedings such as these.

 Pursuant to ARJD 26, “the respondent [judge] must be accorded due process of law.”

 NRS 11.190(4)(b) imposes a two-year statute of limitations for “[a]n action upon a statute for a penalty or forfeiture, where the action is given to a person or the state, or both, except when the statute imposing it prescribes a different limitation.”

 On October 2, 1995, two months after appellant testified at the preliminary hearing, the special prosecutor filed a motion to amend the findings of probable cause to add an additional count accusing appellant of perjury when he “offered testimony concerning the circumstances of his repayment of the loan to Marilyn Bell.” On October 24, 1995, the Commission issued an order finding that the evidence presented at the August 2, 1995 hearing established “a reasonable probability that the evidence available for introduction at a later formal hearing could clearly and convincingly establish grounds for disciplinary action for willfully giving false testimony under oath at [the preliminary hearing].”
Additionally, the Commission ordered the special prosecutor to file a formal complaint charging appellant with perjury. After the Commission rendered its judgment on the first formal complaint and ordered appellant’s *1218 removal from office, it determined that the perjury complaint had been rendered moot. The Commission dismissed that complaint without prejudice. Thus, the Commission is free to proceed with that charge.

 The particular Canons of the NCJC which the Commission found to have been violated by appellant, and the provisions of the ARJD used as grounds for discipline, are reproduced in an appendix to this opinion.

 Appellant also argues that his conduct was not a violation of NCJC Canon 4(D)(1)(b). Although the formal complaint alleged that the loans violated this canon, the Commission did not so find.

 The Commission concluded that there was no violation as to Count 4 because Judge Davis had corrected his conduct in a timely fashion. The Commission also concluded that Count 5 demonstrated poor judgment but was not a violation of the NCJC.

 We recognize that the presence of the two uniformed marshals and appellant’s threats probably had a significant influence on the employee. We also recognize that appellant does not appear to recognize the significance of this type of behavior.

 Ms. Stiles actually stated that it was during work hours, but on her personal breaks or lunch hour.

 An application filed with the Department of Business Industry’s Division of Agriculture lists the Craig Road land as a growing yard for the Davis Nursery, owned by appellant’s mother.

 Photographs in the record depict a veritable “forest” of boxed of potted trees located over the entirety of the subject property.

 Zaloras testified that most of the delay was caused by a problem with getting a judge assigned to the case, but he did feel that there was some delay by appellant at the outset by “asking for 12 months, not removing them, even though [Zaloras had] requested it be done.”

 Segal contributed $250 the next day.

 The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.

 This provision was used only with respect to Count 10 (zoning violation and trespassing).